No. 104,504

STATE OF KANSAS, *Appellee*, v. JAMES ARTHUR QUALLS, *Appellant*.

(298 P.3d 311)

Opinion filed April 12, 2013.

*Charles S. Scott, Jr.*, of Shawnee, argued the cause and was on the brief for appellant.

*Jason E. Geier*, senior assistant district attorney, argued the cause, and *Jodi Litfin*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: A jury convicted James Arthur Qualls of the premeditated first-degree murder of Joseph Beier in violation of K.S.A. 21-3401(a). Qualls admits shooting Beier during a bar fight but appeals his conviction, arguing: (1) there was insufficient evidence of premeditation for first-degree premeditated murder; (2) the district court erred by refusing to instruct the jury on voluntary manslaughter; and (3) he was entitled to an instruction on self-defense.

We reject his argument that the evidence of premeditation was insufficient to support the first-degree murder conviction. But we reverse the conviction and remand for a new trial because Qualls' testimony and his theory of defense supported the requested voluntary manslaughter instruction. The district court erred in not giving that instruction. We hold further that the failure to issue the voluntary manslaughter instruction was not harmless in this circumstance.

## FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of July 16, 2008, Qualls was in a Topeka bar playing pool with the victim's fiance, Amber Martin-

dale. A disagreement ensued about whether Martindale was playing the game by the rules. Beier overheard the conversation and shouted at Qualls that he would bet $100 Martindale "kicks your ass" in a pool game.

At trial, there were minor discrepancies about how this escalated, but both Qualls and Martindale testified that Qualls approached Beier and tried to end the dispute. Martindale testified, "[I]t was not a heated situation at that moment," although she could not recall exactly what was said between the two. Both parties also agree the situation worsened after Qualls' wife approached and said something like, "If y'all believe [Martindale] can make that shot, I bet I can beat her ass," wagering either $100 or $1,000.

Qualls testified that his wife and Beier "started arguing back and forth, cussing and so forth." He said his wife was "basically in [Beier's] face." Qualls also testified that he tried to end the dispute by trying "to get my wife out of his face and I told family members to restrain her."

Beier eventually punched Qualls in the face, which started both men fighting. Qualls testified that he attempted to grab Beier and push him away so Beier could not hit him again. The bartender, Cliff Cormier, testified that he saw Beier punch Qualls in the chin and then stated, "[Beier was] swinging; [Qualls was] swinging down. And they're trying to get a hold of each other evidently." Once they "finally quit swinging," Cormier testified that he grabbed Qualls in a chokehold because Qualls was on top of Beier. Cormier then pulled Qualls away from the fight. Another bar patron, Mitchell McDonald, testified that he grabbed Beier and walked him over against a wall.

Cormier testified that Qualls asked to be let go and indicated he was going to leave the bar. Cormier described Qualls as "very calm. His voice wasn't quaking, very calm." Cormier released Qualls after checking that McDonald had Beier in a "bear hug" against the wall. Cormier testified:

"I turned and picked up a pool stick and [Qualls] is walking towards the door. His wife comes up yelling at me, wanting to know why they were being thrown out, and I told her that it was closing time, everybody was . . . leaving. Okay. At that point [Qualls' wife] walked up and said something to [Qualls] and I assumed she

was giving him car keys or something so they could leave. And I said, 'Come on, Man, let's go.' And I went to grab him by the elbow and he walked, actually kind of quickly, stepped away from me and raised the gun and started firing."

Cormier testified that he could not see Beier when the shooting started because McDonald was between Cormier and Beier, blocking his view. He stated, "[McDonald] was holding [Beier] in front of me. All you could see was [McDonald's] back." Cormier described McDonald as 6'8" tall and probably 400 pounds.

Consistent with the State's theory that Beier was restrained when the shooting started, McDonald testified that he was walking Beier further away from where Qualls was going to go, but he released Beier and pushed him when he heard a bang. McDonald testified that he thought the gun shots were coming from behind him "right across my shoulder."

Qualls testified that he did not see McDonald grab Beier to end the fight because "it was a blank spot from when I went down and being choked out to when I was standing up and asking to be released." This testimony referred to Cormier's statement that he pulled Qualls out of the fight by using a chokehold. Qualls also testified that after Cormier released him, Qualls remembered

"trying to get to the door and I pretty much hearing my wife say something and I turned and looked at my party to make sure, you know, everyone was . . . pretty much with us; not nobody, you know . . . left behind . . . And I seen [Beier] *come around the island and was in a position that looked like he was reaching for a gun.*" (Emphasis added.)

Qualls later described his wife as speaking in an "alerting tone" like screaming his name as if she was fearful.

Qualls further testified that he had a clear view of Beier after the fight broke up and that Beier was unrestrained and coming towards him at an angle. Qualls said he saw Beier's hand go to his waist and then "saw an object. *I saw something, but I couldn't make it out.*" (Emphasis added.) Qualls testified that he believed what he saw was a gun, so he took a gun he was carrying and shot Beier. Qualls also testified that he did not think about shooting Beier before it happened. He said he did not recall whether he had to cock the gun before shooting it and did not recall how many times

he shot Beier. It was not until he was outside the bar before he realized what had taken place.

Another bar patron, Mark Patrick, testified he saw McDonald help break up the fight and hold Beier against the wall. Like Qualls, Patrick testified McDonald was no longer holding Beier during the shooting. Patrick did not testify about what Beier was doing when the shooting started.

Several security cameras in the bar recorded portions of the events described in the testimony. Some video was played for the jury. What was shown depended on the camera's distance from the events. For example, the cameras clearly capture Qualls shooting the gun, but the video does not show Beier in the critical moments before the shooting, nor is there any reference in the record suggesting that Beier could be seen on camera at the moment just prior to the gun fire.

Eleven shell casings were found inside the bar. The coroner testified that Beier suffered 12 gunshot wounds from at least 9 bullets, but he could not tell in what order the wounds were inflicted. Describing the path of the shots, the coroner testified one entered Beier's mid-back, traveled upward, and exited beneath his collar bone. Three superficial gunshot wounds started on the "left side of the back, travel[ed] beneath the skin's surface without entering the chest cavity . . . and then exit[ed] on the right side of the back." Beier also had a superficial gunshot wound starting on the lateral side of his chest moving right; one that entered the lower abdomen and exited outside the left side of Beier's lower chest; one wound to the right forearm; one wound to the penis; three wounds on the left lower leg; one to the right lower leg; and some abrasions on his forehead.

After the shooting, Qualls walked out of the bar with his wife and dropped the gun somewhere in Topeka. Beier was not found with a gun or knife on his person.

The jury was instructed on premeditated first-degree murder and second-degree intentional murder. Qualls requested a voluntary manslaughter instruction, which the trial court denied. There was some discussion during the jury instruction conference of a

self-defense instruction, but the jury was not instructed on self-defense.

The jury convicted Qualls of premeditated first-degree murder. He was sentenced to life in prison, with a mandatory minimum of 25 years. Our jurisdiction arises under K.S.A. 22-3601 (life sentence).

## SUFFICIENT EVIDENCE OF PREMEDITATION

Qualls argues there was insufficient evidence of premeditation to convict him of first-degree murder. We disagree.

### Standard of Review

When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 (2011).

### Analysis

The jury was instructed on the following definition of premeditation from PIK Crim. 3d 56.04(b), which states:

"Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

Premeditation does not necessarily mean that an act is planned, contrived, or schemed beforehand; rather, premeditation indicates a time of reflection or deliberation. *State v. Holmes*, 278 Kan. 603, 632, 102 P.3d 406 (2004). Premeditation and deliberation may be inferred from the established circumstances of a case, provided the inference is reasonable. *State v. Scaife*, 286 Kan. 614, 617, 186 P.3d 755 (2008).

Our caselaw identifies factors to consider in determining whether the evidence gives rise to an inference of premeditation that include: (1) the nature of the weapon used; (2) lack of prov-

ocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. 286 Kan. at 617-18. But this analysis is not driven by the number of factors present in a particular case because in some cases one factor alone may be compelling evidence of premeditation. *State v. Cook*, 286 Kan. 1098, 1102, 191 P.3d 294 (2008). Use of a deadly weapon by itself, however, is insufficient to establish premeditation. *State v. Cosby*, 293 Kan. 121, 134, 262 P.3d 285 (2011).

Qualls argues three pieces of evidence showed the shooting occurred instantaneously without opportunity for any forethought or deliberation. In his brief, he first summarizes Cormier's testimony as "just as Cormier grabbed Qualls' elbow, Qualls turns around and instantly started firing his gun." But this recounting omits an important part of Cormier's testimony. Cormier actually testified that he released Qualls and observed Qualls' wife walk up and say something to him. Cormier then said he told Qualls to leave, stating, "And I went to grab him by the elbow and he walked, actually kind of quickly, stepped away from me and raised the gun and started firing."

Qualls also claims Martindale testified that instantly upon hearing Qualls' wife scream, Qualls began shooting. He apparently bases that claim upon the following exchange:

"Q [Defense counsel:] You just heard a scream?
"A [Martindale:] Yes.
"Q And at that point [Beier] is somewhere over by these tables, right?
"A Yes.
"Q Okay. And the shooting begins?
"A Yes."

But this testimony only establishes a sequence of events—not the instantaneous time frame he alleges. Finally, Qualls relies on McDonald's testimony that the entire shooting incident lasted no longer than 1½ to 2 minutes.

The State argues there was sufficient evidence to infer premeditation, citing the factors established by this court's caselaw. First, the State notes a gun is a deadly weapon. Second, it argues Qualls

lacked provocation at the time of the shooting because the fight had ended. Third, citing Cormier's testimony, it contends Qualls was calmly walking towards the front door before he fired. Fourth, it argues premeditation can be inferred from the fact Qualls shot Beier 11 times, although the State admits the shots occurred in rapid succession. We agree there was sufficient evidence of premeditation. In the light most favorable to the prosecution, a rational factfinder could have found the shooting was premeditated.

Contrary to Qualls' claim that Cormier's testimony supports a finding that the shooting was instantaneous, the jury could have concluded Qualls decided to kill Beier while Qualls' wife spoke to him or while Qualls quickly stepped away from Cormier and raised his gun. In addition, the evidence whether Beier provoked the second attack was contested. The jury could have believed McDonald, who testified he was restraining Beier at the time the shooting started. If so, his testimony negated Qualls' claims that he was provoked and reacted instantly to Beier's attack. We hold there was sufficient evidence of premeditation to support the jury's verdict.

## Voluntary Manslaughter Instruction

Qualls next argues the district court should have issued the requested instruction on voluntary manslaughter based on his honest but unreasonable belief that deadly force was necessary to protect himself or his family from Beier's imminent use of unlawful force. Qualls principally relies on his trial testimony that he believed Beier was reaching for a gun, but he also argues the coroner's report supports his claim.

### Standard of Review

This court recently clarified the analytical progression and standard of review for each step when considering on appeal whether a jury instruction should have been given:

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the

defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

*Analysis*

Qualls properly preserved the issue as to whether a lesser included offense should have been given. As to our second analytical point, this court has long held that voluntary manslaughter is a lesser included offense of first-degree premeditated murder under K.S.A. 21-3107(2)(a). *State v. Gallegos*, 286 Kan. 869, 874, 190 P.3d 226 (2008). Therefore, the voluntary manslaughter instruction was legally appropriate.

The real question in this case focuses on whether the trial record factually supported giving the instruction when viewed in the light most favorable to Qualls, the requesting party. Qualls' threshold argument is that the district court improperly resolved a factual dispute when it denied giving the instruction after concluding there was no evidence of the imminent use of unlawful force. Qualls contends the district court necessarily based that determination on its factual conclusion that McDonald testified truthfully that he was holding Beier when Qualls began shooting. But this argument lacks merit because the district court actually accepted Qualls' testimony that Beier had his hand at his waist. The district court stated:

"Now in this case applying an objective standard here there was an altercation but the evidence doesn't reflect that the deceased had a weapon [or] that it was seen. All that could be said is that he had his hand at his waist, whatever that means, and it certainly isn't an indicator of imminent death or great bodily harm to the defendant."

But the error in the district court's reasoning is not that it refused to believe Beier had his hand at his waist; it is in its application of an objective standard when deciding whether to give the instruction. And the district court stated twice that it was applying an objective standard to resolve that question.

Under K.S.A. 21-3403(b), voluntary manslaughter requires an intentional killing that is committed with an unreasonable but honest belief that the circumstances justify deadly force to defend

against an aggressor's imminent use of unlawful force under K.S.A. 21-3211. And under the voluntary manslaughter theory known as imperfect self-defense recited in K.S.A. 21-3403(b), there is no objective requirement. *State v. Ordway*, 261 Kan. 776, 787-88, 934 P.2d 94 (1997) ("Both elements in the offense of voluntary manslaughter as defined in 21-3403[b] are subjective."). Therefore, what the district court needed to resolve was whether there was evidence of Qualls' subjective belief that unlawful force was imminent when that evidence is viewed in the light most favorable to Qualls. And as to that, there is no doubt based upon Qualls' testimony that he had a clear view of Beier, saw Beier's hand go to his waist, and "saw an object. I saw something, but I couldn't make it out." Qualls unequivocally testified he believed Beier had a gun, so he shot him.

The State admits a defendant's statements may be sufficient by themselves to require issuing a lesser included offense instruction. See, *e.g.*, *State v. Berry*, 292 Kan. 493, 515, 254 P.3d 1276 (2011); see also *State v. Tahah*, 293 Kan. 267, 273, 262 P.3d 1045 (2011) (defendant's confession could reasonably support lesser included offense instructions). But the State argues the video shows Beier was not an imminent threat to Qualls when Qualls shot him, so the jury could not reasonably have convicted Qualls in accordance with the defense's theory. The State supports this argument by relying in its brief only on video footage of the fistfight, which does not depict Beier immediately before he was shot. At oral argument, counsel for both parties acknowledged the video evidence does not refute Qualls' testimony that he saw Beier reach for an object at his waist or believed he had a gun in the critical moments just before the shooting. Our review of the video supplied with the record on appeal confirms counsels' observations.

The absence of video evidence showing Beier just before the shooting occurs leaves us with the trial testimony and that is where the outcome tips in favor of Qualls' argument. McDonald testified he was restraining Beier when the shooting started. Qualls and Patrick testified that McDonald actually had released Beier. But Patrick did not testify about what Beier was doing once he was released. And on that point, the dissent is correct that there is no

evidence corroborating Qualls' claim that Beier was approaching him and reaching for something at his waist. But the dissent necessarily makes a credibility determination when it concludes that Qualls' testimony is "unsupported, imagined, and mistaken."

Qualls was entitled to instructions on the law applicable to his defense theory if there was evidence to support that theory, as long as the evidence when viewed in the light most favorable to him was sufficient to justify a rational factfinder finding in accordance with that theory. *State v. Anderson*, 287 Kan. 325, 334, 197 P.3d 409 (2009). And this is true even if Qualls' defense theory was only supported by his own testimony. See 287 Kan. at 336. Patrick's testimony supports Qualls' claim that McDonald was not restraining Beier when the shooting started. And there is no other evidence contradicting Qualls' claim that Beier was coming towards him. The dissent simply does not find Qualls' testimony credible, but there is nothing in the record allowing us to conclude that a rational factfinder could not find in accordance with Qualls' theory.

We hold that the record in the case when viewed in the light most favorable to Qualls was sufficient to submit the instruction to the jury and allow it to decide if Qualls had an unreasonable but honest belief that the use of deadly force was necessary to protect against Beier's alleged imminent use of unlawful force. This holding takes us to the fourth and more challenging inquiry whether the failure to issue the requested instruction was harmless. In *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012), this court established the following test for harmlessness:

"[B]efore a Kansas court can declare an error harmless it must determine the error did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome. The degree of certainty by which the court must be persuaded that the error did not affect the outcome of the trial will vary depending on whether the error implicates a right guaranteed by the United States Constitution. If it does, a Kansas court must be persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, *i.e.*, there is no reasonable possibility that the error contributed to the verdict. If a right guaranteed by the United States Constitution is not implicated, a Kansas court must be persuaded that there is no reasonable probability that the error will or did affect the outcome of the trial."

Notably, prior to oral argument, neither party identified the harmless error standard that would apply if the court reached this point in the analysis. Qualls generally asserted that a criminal defendant had a constitutional right to present his or her theory of defense, which may have implied that we should invoke the more stringent constitutional error approach. But an alternative argument could be made that the error impacted a statutory right only because K.S.A. 22-3414(3) directs that jury instructions must be given when there is some evidence that would reasonably justify a conviction of some lesser included crime. At oral argument, the parties gave the court little guidance as to this question.

This court encountered the same problem in *State v. Backus*, 295 Kan. 1003, 287 P.3d 894 (2012), in which we held the parties' failure to argue the applicable standard would not deter our resolution of the issue. In that case, we determined under the higher standard that the court was firmly convinced beyond a reasonable doubt that there was no impact on the trial's outcome, so the defendant would not be prejudiced by the court's holding. 295 Kan. at 1008-09. In Qualls' case, there is an opposite outcome because we are convinced a new trial is required under either harmless error analysis. This result is driven by the evidence of premeditation, which was sufficient to support the jury's verdict of first-degree premeditated murder but was not so "abundant" as to convince us that the requested voluntary manslaughter should have been rejected. See *State v. Haberlein*, 296 Kan. 195, 205, 290 P.3d 640 (2012) (noting the premeditation was "peculiarly abundant" given the defendant's statements before the robbery, inconsistencies in his statements, and overall defense strategy).

Qualls' defense theory was that he shot Beier because he believed Beier was reaching for a gun. Qualls never departed from that theory. Thus, the voluntary manslaughter instruction under an imperfect self-defense theory was directly applicable to Qualls' defense strategy. Moreover, Qualls did not make any statement before the shooting from which premeditation could be inferred. In other words, we hold the evidence of first-degree murder was not so strong that it rendered the instructional error harmless under

either standard. Therefore, we reverse Qualls' conviction and remand for a new trial.

This outcome makes it unnecessary to decide Qualls' final argument that he was entitled to an instruction on self-defense, and we decline to do so because the evidence on retrial might change the analysis as to whether a self-defense instruction is appropriate.

BEIER, J., not participating.

＊ ＊ ＊

ROSEN, J., concurring in part and dissenting in part: I agree with the majority's well-reasoned conclusion finding sufficient evidence of premeditation. However, I respectfully dissent from that part of the majority opinion which finds reversible error by concluding that the record demonstrates a duty to instruct the jury on voluntary manslaughter. I will not belabor the point; I would simply find on this record and, consistent with my dissenting opinions in *State v. Haberlein*, 296 Kan. 195, 213, 290 P.3d 640 (2012), *State v. Tahah*, 293 Kan. 267, 280, 262 P.3d 1045 (2011), and *State v. Scaife*, 286 Kan. 614, 627, 186 P.3d 755 (2008), the trial judge did not err when it denied Qualls' request to instruct the jury on voluntary manslaughter.

Even viewing the evidence in the light most favorable to Qualls, I simply cannot agree that we are required to adopt Qualls' unsupported, imagined, and mistaken subjective belief that his use of deadly force was necessary to protect against Beier's alleged imminent use of unlawful force. The evidence in this case shows that while Beier was being restrained by a man described as being "6 feet 8 inches and probably 400 pounds" and moving away from Qualls, or within seconds thereafter, Qualls opened fire while moving towards the unarmed Beier and shooting him 11 times, the final shots fired at close range with Qualls leaning over a small table where Beier lay defenseless on the floor. Qualls' testimony that he shot Beier multiple times because he saw Beier's hand at his waist and feared he had a gun approaches new levels of implausibility. Here, he fired 11 bullets into his restrained, unarmed victim—surely giving ironic new meaning to the term "overkill."

K.S.A. 22-3414(3) provides that "where there is some evidence which would reasonably justify a conviction of some lesser included crime . . . , the judge shall instruct the jury as to the crime charged and any such lesser included crime." As the trial judge determined, the evidence produced at trial does not warrant the giving of a voluntary manslaughter jury instruction and is insufficient to permit a rational factfinder to find Qualls guilty beyond a reasonable doubt of that crime.

Furthermore, even if I were to agree that the failure to include a voluntary manslaughter jury instruction was error, the majority's finding that the error is not harmless is even more perplexing. If rushing towards and shooting a defenseless person 11 times, with the final shots fired while the shooter is leaning over a table while the victim lies helplessly wounded on the floor, coupled with the perpetrator then "calmly" leaving the scene and dropping his weapon "somewhere in Topeka" where it is never found—evidence indicating that his actual fear was accountability for his unconscionably violent actions—is not strong enough or "abundant" enough to render the instructional error harmless, I do not understand what evidence would suffice to make it so.

It bears repeating that the test set forth in K.S.A. 22-3414(3) is not a theoretical one. Instead, it requires the trial judge, who has heard, seen, and evaluated all of the evidence in the case, to determine whether there is "some evidence which would *reasonably justify a conviction*" of the lesser included crime. (Emphasis added.) We have now completely abrogated the trial judge's role in making that determination. The standard now appears to require the trial judge or reviewing court to unconditionally accept ephemeral evidence—or nonevidence—and to apply it to any speculative scenario that the facts of the case may provide (*Haberlein* and *Scaife*); or to whatever is proclaimed by the defendant in the investigatory phase of a crime, whether corroborated or not or even later recanted at trial (*Tahah*); or now, to whatever imagined subjective belief that is put forth by the defendant that is not supported by the evidence in determining whether a lesser included offense jury instruction is required in premeditated first-degree murder trials. By employing such a standard in these cases, the trial judge

in reality has no option but to instruct on all lesser included offense jury instructions, regardless of whether they are requested and in spite of the actual evidence. As I have opined in my previous dissents on this issue, that has never been the law and should not become the law of this state.

MORITZ, J., joins in the foregoing concurring and dissenting opinion.