No. 106,103

STATE OF KANSAS, *Appellee*, v. TODD D. SCHUMACHER, *Appellant*.

(322 P.3d 1016)

Opinion filed March 7, 2014.

*William K. Rork*, of Rork Law Office, of Topeka, argued the cause, and *Wendie C. Miller* and *Kenneth B. Miller*, of the same firm, were with him on the briefs for appellant.

*Natalie Chalmers*, assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

MORITZ, J.: A jury convicted Todd Schumacher of first-degree premeditated murder and endangering a child after he shot and killed his ex-wife while his daughter watched nearby. In this direct appeal, he seeks reversal of both convictions based on insufficient evidence. Alternatively, he contends the district court abused its discretion in denying his motion for a new trial based on prosecutorial misconduct in rebuttal closing argument.

Because we find the State presented sufficient evidence of both convictions and the prosecutor did not commit misconduct justifying reversal, we affirm Schumacher's convictions.

### FACTUAL AND PROCEDURAL BACKGROUND

Generally, the evidence presented at Schumacher's trial showed that on March 22, 2010, Schumacher learned that his ex-wife Ann was seeking child support and full custody of two of the couple's three children. The following morning, Schumacher went to Ann's home before the children left for school. Schumacher had a brief conversation with Ann at the door of the home before pulling a gun out of his jacket and firing it at Ann, killing her instantly as their 15-year-old daughter watched nearby. Afterward, Schumacher drove to the Wichita County Sheriff's Office and turned himself in. More specifically, the evidence presented at trial showed as follows.

Marnie Johnson had been dating Schumacher for approximately 3 months when she received a phone call from him early in the evening of March 22, 2010. Johnson could tell Schumacher had been drinking because his speech was slurred. Schumacher told her he was angry because he received paperwork from Ann informing him she was seeking custody of their two youngest children. A few hours later, Schumacher sent Johnson a text message saying: "It ends tonight."

After receiving the text, Johnson initially thought Schumacher might be suicidal so she called him to check on him. In that conversation, Schumacher told Johnson that he loved her and he was sorry. Schumacher also remarked that he was "going to kill her." Johnson inferred from context that the "her" Schumacher referred

to was Ann. Johnson testified that Schumacher previously had threatened to harm Ann, but Johnson had not taken the threat seriously. But because of the tone of Schumacher's voice, Johnson believed Schumacher might be serious this time. So after ending her call with Schumacher, Johnson called Schumacher's sister-in-law, Laura Schumacher.

Laura, who is married to Schumacher's brother Tracy, testified Johnson called her and told her Schumacher had been drinking and had threatened to kill Ann. Laura told Johnson she would handle the situation.

Laura then called Schumacher, who told Laura he was heading to his friend Dale Gerstberger's home. Laura could tell Schumacher was drunk. Laura testified Schumacher was "distraught and upset" because Ann was seeking custody of two of the couple's children. In an attempt to calm Schumacher, Laura reminded him the custody dispute could be resolved in court and told him not to confront Ann. Schumacher replied, "[I]f she takes my kids away, I'm going to kill her." Laura told Schumacher that his children needed two parents and that he would go to prison for killing Ann. Schumacher replied that his kids would be better off without him. Laura testified that in the past Schumacher had made this remark when he was suicidal but she did not know his meaning on this occasion. During the call, Schumacher seemed to calm down.

While Laura was still talking with Schumacher, she asked her husband Tracy to go to Ann's home to insure that Schumacher did not confront Ann. On cross-examination, Laura testified she did not believe Schumacher would harm Ann but she was worried that he would do something "wrong." Laura testified that if Schumacher had gone to Ann's home, she would have called the police.

Tracy testified he had never heard Schumacher threaten Ann before and while he took the threat seriously enough that he went to Ann's home, Tracy never imagined Schumacher would shoot Ann. Tracy waited in his vehicle in front of Ann's home until he spoke by phone with Gerstberger and verified that Schumacher had arrived at Gerstberger's home.

Gerstberger testified that when Schumacher arrived at Gerstberger's home about 11 p.m., he was "terribly drunk" and upset

with Ann. Over the next hour and a half, Schumacher told Gerstberger two or three times that he wanted to kill Ann. Gerstberger had never previously heard Schumacher threaten Ann, and he thought Schumacher was just drunk. As the two men sat drinking coffee, Gerstberger said Schumacher became more "rational and not as upset" and stopped threatening Ann. Gerstberger thought Schumacher was mostly sober when he left at around 2 a.m.

At the time of these events, Schumacher and Ann's 17-year-old daughter, Megan, lived with Schumacher. Megan testified that on the evening of March 22, 2010, her aunt, Laura Schumacher, called to tell her that Schumacher was upset and drunk and had threatened to kill Ann. But Megan testified, "[Laura] said that [Schumacher] stated that, but I don't know. He just was really upset about what had happened." Nevertheless, Megan sent a text message to a cousin that evening: "Well, I guess mom filed for full custody and dad is going to kill her."

When Megan woke up on the morning of March 23, 2010, she saw that Schumacher had sent her a text about 2 a.m. as he was leaving Gerstberger's home. In the text, Schumacher told Megan she was his "everything" and he loved her. Schumacher was not home when Megan got up that morning.

Schumacher and Ann's 15-year-old daughter, M.S., testified that she and her brother were both still at Ann's home when Schumacher arrived the morning of the shooting. As M.S. prepared to go to a neighbor's home where she had a ride to school, she saw Schumacher just outside the front door talking to Ann. M.S. heard her parents arguing and decided to stay in the living room where she sat on the arm of a chair so she could still see her parents.

During the confrontation between her parents, M.S. recalled that she had a small camera in her pocket. M.S. knew a custody battle was pending so when she heard Schumacher making false statements, she held the camera by her side and turned on the its video function.

M.S. heard Ann tell Schumacher that he was harassing her, and Schumacher replied, "[S]o this is harassment[?]" Ann responded, "[Y]eah, this, this is harassment." According to M.S., at this point Schumacher unzipped his jacket, stepped forward into the house,

put his hand on Ann's shoulder, and pressed a gun underneath her chin. Ann gasped, and the gun fired. M.S. testified Ann immediately fell to the floor. Schumacher then went to his pickup and "after awhile he drove off."

The State admitted M.S.'s video and played it for the jury. M.S. testified she did not "flaunt" the camera, so the image darts around the room and the audio is partially obscured as M.S. apparently covers or scrapes the microphone. The State introduced, and the district court admitted, multiple copies of the recording, including an enhanced, audio-only version intended to reduce background noise.

The video shows Ann standing just inside the front door speaking to Schumacher, who cannot be seen. At one point, Ann says to Schumacher, "I'm not going to get into it," to which Schumacher replies, "Well, you can't hang up the phone now. You can't file phone harassment charges on me." Ann then asks, "Why?" The next few statements are inaudible until Ann sighs and clearly says, "Wow, what an example you're being for your kids right now." After a few moments of unintelligible conversation, Schumacher then says, "Here's your fucking example, right here." Ann gasps, and the gun can be heard firing. In the last portion of the recording, the two children can be heard screaming and clamoring as they try to help Ann.

The 911 dispatcher for the area testified that she received a call from M.S. at 8:18 a.m. and sent law enforcement to Ann's address. Four minutes later, Schumacher walked into the sheriff's office where the dispatcher sat, threw up his hands, said, "Call [the sheriff], I'm here," and then sat down in a chair. The dispatcher testified that at one point before the undersheriff arrived and took Schumacher into custody, Schumacher chuckled.

Jamie Oeberst, M.D., the chief medical examiner at the Sedgwick County Regional Forensic Science Center, examined Ann and determined that a single gunshot wound to her neck and head caused her death. Based on the stippling, or gunpowder deposited on the body, Dr. Oeberst determined the shot that killed Ann was fired from a distance of only 1 to 3 feet.

Several Kansas Bureau of Investigation (KBI) agents also testified regarding their investigation of Ann's death. Agent Brian Carroll searched the pickup Schumacher drove to Ann's home and found a .357 caliber Ruger revolver (Ruger). It contained no live shell casings. Carroll also found ammunition for a .22 caliber gun in the pickup.

Case agent John Nachtman testified he photographed the scene of the shooting and collected, viewed, and enhanced the video from M.S.'s camera. Nachtman also searched the vehicle Schumacher normally drove and found a Smith and Wesson .22 caliber gun, ammunition for the Smith and Wesson, and a case for a Ruger revolver that used .357 caliber ammunition.

KBI firearm and tool mark examiner Zachary Carr testified about his examination of the Ruger and explained that in order to fire the weapon, "the hammer has to be manually pulled to the rear to cock it" and then "the trigger has to be moved rearward." He later emphasized, "This firearm will not fire unless this hammer is pulled back. You can pull the trigger all you want, nothing will happen." Further, Carr testified that approximately 3¾ pounds of pressure is required to pull the trigger.

Carr further testified his examination of the bullet fragments taken from Ann's body showed they were fired from the Ruger found in Schumacher's pickup. At defense counsel's urging, Carr provided gloves so jurors could examine the Ruger during deliberation.

Schumacher testified in his own defense and initially discussed several events preceding Ann's shooting. Schumacher explained that after he and Ann divorced, they initially shared custody, with the children living with him for a month and then with Ann for a month. According to Schumacher, because of the stress of the divorce and his farming operation, his mental health deteriorated in 2009. Schumacher testified that in December 2009, his friend Troy Wright found Schumacher in his pickup with the Ruger cocked. According to Schumacher, he had twice raised the gun to his own temple but could not pull the trigger. After this incident, Schumacher spent several days in the Greeley County Hospital.

Schumacher further testified that on another unspecified occasion he tried to commit suicide by taking medication and drinking alcohol but Laura found him alive. Further, he solicited quotations for life insurance policies to provide for his children because he "wasn't going to be around."

Schumacher conceded that he was upset when he received the custody paperwork from Ann on March 22, 2010, but he claimed he did not remember threatening Ann. He said he was drunk that day, and after he left Gerstberger's home, he went to his own home and looked at some bills, which further depressed him because for quite some time he had been borrowing $3,000 a month to cover his personal and farming operation expenses.

Schumacher decided to kill himself with "one special bullet," a single shot from his Ruger. According to Schumacher, he purchased both the special bullet and the Ruger from his college roommate and he always kept the Ruger cocked and with him because of a fear that he would get trapped in a fiery car accident and not be able to get out.

Schumacher testified he initially went to a pasture to kill himself but then decided that Ann should know what she was doing to him, so he decided to go to her house and shoot himself on the front porch after the kids had left for school. Schumacher realized when he arrived at Ann's home that his son and daughter had not left for school. Nevertheless, he claimed that since he had made up his mind to kill himself, he did not leave. Schumacher testified that when he "went to shoot" himself, he heard a bang and realized what happened, so he walked away to turn himself in. Schumacher denied that he intended to kill Ann.

Several witnesses corroborated Schumacher's suicidal tendencies. Troy Wright testified for the defense that in early December 2009 he spoke to Schumacher, who said that "he was through," and a few hours later Wright found Schumacher sitting in his pickup with the Ruger cocked. Brandon Leubbers, a friend of Schumacher's, testified he spoke with Schumacher regularly and that on two occasions Luebbers talked Schumacher out of "just ending it all." Laura recalled the incident where she found Schumacher unconscious, and said she had talked Schumacher out of

committing suicide at least twice. Laura also said that the night of March 22, 2010, she was more worried about Schumacher killing himself than harming anyone else. Tracy said that when he first saw the ambulance at Ann's house, he thought Schumacher had killed himself. Johnson, Megan, and Gerstberger also testified that Schumacher had talked about suicide.

Ultimately, the jury convicted Schumacher of first-degree premeditated murder and endangering a child by placing M.S. at risk of harm. Schumacher was sentenced to 25 years to life for the murder conviction and a concurrent 1-year jail term for his child endangerment conviction.

## DISCUSSION

In this direct appeal, Schumacher argues the State presented insufficient evidence of both his convictions and the district court abused its discretion in refusing to grant his motion for mistrial based on prosecutorial misconduct. We will first address his sufficiency challenges.

*Both of Schumacher's convictions are supported by sufficient evidence.*

Schumacher argues his convictions for first-degree premeditated murder and endangering a child were not supported by adequate evidence. In doing so, he focuses primarily on controverted evidence and ignores evidence supporting the convictions.

But in reviewing whether the State presented sufficient evidence of a crime, we must examine the evidence in a light most favorable to the prosecution and determine whether a reasonable factfinder could have found beyond a reasonable doubt that the defendant committed the crime. In evaluating the sufficiency of the evidence, we do not reweigh evidence, resolve conflicts between evidence, or make credibility determinations. See *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 (2011).

*The State presented sufficient evidence of premeditation.*

Focusing on the element of premeditation, Schumacher argues the State failed to sufficiently prove first-degree premeditated murder. He argues he had already cocked the gun when he went

to Ann's home and that his history of suicidal tendencies supports his claim of an accidental shooting. Further, he asserts the court should disregard evidence of his threats to kill Ann because only Johnson believed them.

A premeditated act is not necessarily one that is "planned, contrived, or schemed beforehand; rather, premeditation indicates a time of reflection or deliberation." *State v. Qualls*, 297 Kan. 61, 66, 298 P.3d 311 (2013). A defendant's premeditation can be inferred from the circumstances, and in fact, direct evidence of premeditation is rare. 297 Kan. at 66; see *State v. Hall*, 292 Kan. 841, 859, 257 P.3d 272 (2011). Several factors can give rise to an inference of premeditation: (1) the nature of the weapon used; (2) a lack of provocation; (3) the defendant's conduct before and after the incident; (4) the defendant's threats and declarations before and during the incident; and (5) whether the defendant dealt lethal blows after the victim was helpless. *Qualls*, 297 Kan. at 66-67. The State need not present evidence of each factor to prove premeditation; in some cases proving the presence of just one factor may be sufficient. The use of a deadly weapon, however, is insufficient on its own to establish premeditation. 297 Kan. at 67.

We have no hesitancy in concluding that, when viewed in a light most favorable to the State, the State presented more than sufficient evidence of premeditation. While several witnesses testified regarding Schumacher's prior suicidal tendencies, the State's evidence demonstrated that on this occasion Schumacher told several people he intended to kill Ann but did not threaten his own life. Moreover, Johnson believed Schumacher would harm Ann because of the "tone of his voice," and Laura conceded that if Schumacher had gone to Ann's home that night, Laura would have called the police out of a fear he would do something "wrong." Further, regardless of whether Schumacher's friends and relatives believed his threats, when viewed in the State's favor, Schumacher's repeated threats to kill Ann demonstrate Schumacher's state of mind the night before he shot Ann. See *State v. Cook*, 286 Kan. 1098, 1102, 191 P.3d 294 (2008) (finding sufficient evidence of premeditation based in part on defendant's threats despite witness' testimony he did not take threat seriously).

Further, other facts support an inference of premeditation, including Schumacher's use of a deadly weapon and his actions before and after the shooting. Specifically, according to M.S.'s testimony, Schumacher unzipped his jacket, took out a loaded gun, stepped into the house, put his hand on Ann's shoulder, and placed the gun under Ann's chin. After Schumacher saw Ann fall to the ground, he went to his pickup, nonchalantly turned himself into law enforcement, and chuckled while waiting to be taken into custody.

Finally, although the evidence indicated Schumacher was upset about Ann's efforts to seek custody of their children, there was no evidence indicating Ann "provoked" Schumacher's actions. And Schumacher shot Ann while the two of them were engaged in a relatively calm confrontation during which neither party yelled or seemed overly agitated. See *State v. Pabst*, 268 Kan. 501, 513, 996 P.2d 321 (2000) (finding sufficient evidence of premeditation in part because although defendant and victim were engaged in a "mild, nonviolent argument," defendant was not provoked).

We conclude that a rational factfinder could have concluded beyond a reasonable doubt that Schumacher premeditated the killing.

*The State presented sufficient evidence of endangering a child.*

Next, Schumacher argues "there is insufficient evidence M.S. was intentionally and unreasonably placed in a situation where there was a reasonable probability her life, body or health would be injured or endangered."

K.S.A. 21-3608(a) provides: "Endangering a child is intentionally and unreasonably causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health may be injured or endangered." See also *State v. Daniels*, 278 Kan. 53, 72-73, 91 P.3d 1147, *cert. denied* 543 U.S. 982 (2004) (finding State presented sufficient evidence of endangering a child when defendant conducted a bank robbery while a child waited in car). To prove child endangerment, the State must prove more than a "faint or remote possibility" of harm. See *State v. Cummings*, 297 Kan. 716, 731, 305 P.3d 556 (2013).

Schumacher's insufficiency argument is not entirely clear, but based on the facts he references, it appears he contends the State failed to prove he unreasonably placed M.S. in danger, *i.e.*, that the level of dangerousness was high enough to justify a conviction.

But Schumacher testified he knew the children were still at home, and M.S. testified that after arguing with her mother, Schumacher stepped inside the house and into the living room where M.S. was seated and fired the gun. Under these circumstances, we have no hesitancy in concluding the State presented sufficient evidence to prove that Schumacher unreasonably caused M.S. to be placed in a situation in which there was more than a faint or remote possibility that her life, body, or health might have been injured or endangered, thereby committing the crime of endangering a child.

*The district court did not err in denying Schumacher's new trial motion.*

Schumacher next argues the district court abused its discretion in denying his motion for a new trial based on prosecutorial misconduct. Specifically, Schumacher contends the prosecutor commented on a fact not in evidence when he cocked the gun during his rebuttal closing argument and asked the jury to compare the sound of the gun cocking with the sound heard on M.S.'s video just before Schumacher shot Ann. Additionally, Schumacher contends the prosecutor committed misconduct by twice asking for justice for Ann, thereby violating this court's precedent prohibiting a prosecutor from asking for justice for the victim.

We review a district court's decision on a motion for new trial for an abuse of discretion. *State v. Rojas-Marceleno*, 295 Kan. 525, 539, 285 P.3d 361 (2012). Judicial discretion is abused when the trial court commits an error of law. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). Because prosecutorial misconduct claims do not require factfinding, the question is essentially one of law; and when a district court fails to order a new trial after reversible prosecutorial misconduct has been committed, it abuses its discretion.

To determine whether a prosecutor committed reversible misconduct, we first decide if the challenged comment exceeded the

wide latitude of language and manner afforded the prosecutor when discussing the evidence. If the comment was outside these bounds, we next decide if the comment constitutes reversible error, *i.e.*, whether the comment was so prejudicial as to deny the defendant a fair trial. *State v. Brown*, 295 Kan. 181, 210, 284 P.3d 977 (2012); see also *State v. Akins*, 298 Kan. 592, Syl. ¶¶ 1-2, 315 P.3d 868 (2014) (discussing factors used in reversibility analysis).

*The prosecutor did not commit misconduct when he asked the jury to compare the sound of the gun cocking heard in open court with a "click" heard on the recording.*

First, we consider Schumacher's argument that the prosecutor committed misconduct in suggesting the jury compare the sound of the gun cocking to the clicking sound heard on the video just before the shooting. Schumacher contends this was error because the State failed to establish through expert testimony that the sound the jury heard on the video was the same sound made when the prosecutor cocked the gun in open court during his rebuttal.

The prosecutor devoted much of his rebuttal closing argument to discussing and replaying the video taken by M.S. and arguing the video contains an audible "click," which the prosecutor asserted was the sound of Schumacher cocking the gun. More specifically, the prosecutor argued the sound of a cocking gun is "very distinctive," and he cocked the weapon a total of nine times throughout his rebuttal argument. At one point, Schumacher objected, arguing that the prosecutor's assertion that the click heard on the video was the sound of Schumacher's gun cocking was a fact not in evidence.

We have reviewed the videos and note that the unenhanced video does contain an audible "click" about 45 seconds into the video in the middle of a statement made by Schumacher just moments before he shoots Ann: "Here's your fucking example, [click], right here."

Preliminarily, we note that Schumacher's argument appears to be premised on two inaccuracies. First, Schumacher emphasized that because the audio had been enhanced, the State should have been required to put on expert testimony to compare the two

sounds. But a review of the recordings reveals that the clicking noise is distinctly more audible on the unenhanced version of the recording than on the enhanced version, which was designed to eliminate background noises and highlight the conversation between Schumacher and Ann.

Second, Schumacher's argument is based in part on the fact that the prosecutor was the first person to demonstrate in open court the sound of the gun cocking. However, citing to the transcript, the State suggested in its response brief that defense counsel first cocked the gun for the jury during his closing argument. When questioned by this court during oral argument about the State's assertion, Schumacher's appellate counsel, who also was his trial counsel, adamantly denied that he had done so, exclaiming, "No way did I cock that gun. Absolutely, positively not."

But our review of the record reveals that the State is correct. Despite his strong denial, defense counsel did in fact cock the gun for the jury during his closing argument and did so prior to the prosecution cocking the gun. Specifically, while explaining how Dr. Oeberst's and Carr's testimonies supported Schumacher's accidental shooting defense, defense counsel said, "If I want to kill somebody and I'm standing there on the front porch . . . and I pull out a gun and it is already cocked, (cocking gun), no matter [what] . . . it has to be up, gun up." Further, it was defense counsel who suggested the jurors be given gloves so that they could examine the gun and operate it themselves.

Thus, as the State points out, before the prosecutor ever cocked the gun for the jury and asked the jury to listen to the sound of the click, the gun had been cocked by defense counsel. Further, the video in which the clicking sound can be heard had been played for the jury and introduced into evidence. Thus, the real issue is whether the prosecutor commented on a fact not in evidence by asking the jury to *compare* two sounds in evidence.

Our caselaw does not support Schumacher's suggestion that the prosecutor asked the jury to draw an inference "akin to a scientific conclusion" by asking it to find that the clicking sound heard on the recording was the sound of the gun being cocked. See, *e.g.,* *State v. Chanthaseng*, 293 Kan. 140, 146-47, 261 P.3d 889 (2011)

(concluding that prosecutor's suggestion that witness' staggered disclosure was typical of trustworthiness was akin to scientific conclusion and improper comment on facts not in evidence); *State v. Simmons*, 292 Kan. 406, 412-14, 254 P.3d 97 (2011) (finding prosecutor committed misconduct in stating in voir dire that victim suffered from Stockholm Syndrome when prosecutor was not an authority on that syndrome, State did not introduce evidence of syndrome at trial, and term is rarely used in scientific community).

Similarly, the facts of this case are not comparable to circumstances in which we have found that the prosecutor commented on or stated facts not in evidence. See, *e.g.*, *State v. Scott*, 286 Kan. 54, 84, 183 P.3d 801 (2008) (determining prosecutor improperly commented on fact not in evidence when he said he had listened for 60 hours to recording of defendant's confession); *State v. Bradford*, 219 Kan. 336, 340, 548 P.2d 812 (1976) (concluding prosecutor inappropriately commented that blood test revealed defendant's blood type when no evidence of blood test had been admitted).

Instead, the prosecutor here simply asked the jury to compare the sound heard in the courtroom with the sound on the video. Further, the prosecutor reminded the jury it could "decide what that sound [on the video] is." Under these circumstances, we find the trial court correctly concluded that the prosecutor fairly commented on the evidence and did not commit misconduct when he suggested that the clicking sound heard when the gun was cocked was the same clicking sound heard on the video just prior to Schumacher shooting Ann.

*The prosecutor committed error when he asked for justice for Ann, but it does not require reversal.*

Schumacher also argues that the prosecutor committed reversible misconduct in his rebuttal closing argument when he said, "You can laugh about justice, that word, but it means something and it certainly means something for Ann Schumacher," and when he said, "Your verdict is the last word for Ann Schumacher, and it's the last word for justice."

Schumacher argues our caselaw is clear that asking for justice for a victim exceeds the bounds of permissible argument. The State concedes that in *State v. Brinklow*, 288 Kan. 39, 52, 200 P.3d 1225 (2009), this court determined "arguing for a conviction to give the victim justice is prosecutorial misconduct," but the State argues that statement is unsupported dicta.

We decline the State's invitation to abridge or somehow lessen our holding in *Brinklow*. Instead, we reiterate that a prosecutor cannot ask the jury to convict a defendant in order to give the victim justice. See, *e.g.*, *State v. Anderson*, 294 Kan. 450, 462-63, 276 P.3d 200 (2012) (finding prosecutor erred in referring to defendant as a "little, little man" and asking for "redemption" for victim, as this request was akin to asking for justice for victim and improperly diverted jury's attention from its task); but see *State v. Britt*, 295 Kan. 1018, 1031, 287 P.3d 905 (2012) (refusing to find error when prosecutor generally asked for justice rather than seeking justice specifically for victim or community); *State v. McCorkendale*, 267 Kan. 263, 284-86, 979 P.2d 1239 (1999) (declining to find error, in part because prosecutor's challenged comment was not appeal to render justice to victim).

Further, we have often noted that we cannot condone any act or statement by the prosecutor which draws jurors' attention away from their fundamental task of weighing the evidence and instead invites them to rely on underlying emotions to convict the defendant. See *Simmons*, 292 Kan. 418-19 (prosecutor's comment that appealed for sympathy for victim inappropriately diverted jury's attention from its fundamental task); *State v. Payne*, 260 Conn. 446, 462-63, 797 A.2d 1088 (2002) (agreeing that prosecutor inappropriately appealed to jurors' emotions by asking jury to find defendant guilty out of sympathy for victim and his family); see also *Rose v. State*, 123 Nev. 194, 210, 163 P.3d 408 (2007) (concluding prosecutor committed misconduct by appealing to jurors' sympathies when he asked jurors to insure that victims "also get their justice"). Here, the prosecutor's requests for justice for Ann appear to have been intended to appeal to jurors' empathy instead of their task at hand—to weigh and evaluate the evidence in determining Schumacher's guilt.

Despite our conclusion that the prosecutor twice inappropriately requested justice for Ann, we further find that those errors do not require reversal. Both comments were fleeting and made in the context of reminding the jury of its proper role. Further, the prosecutor mitigated any harm by reminding the jury that it should not rely on sympathy. And after making these statements, the prosecutor fully discussed the State's evidence and explained how it supported a finding of guilt beyond a reasonable doubt on both charges.

Given these circumstances and the strength of the State's evidence, we conclude the prosecutor's brief comments were not so prejudicial as to deny Schumacher a fair trial.

Affirmed.