NOT DESIGNATED FOR PUBLICATION

No. 118,617

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRADLEY THOMAS GILLESPIE,
*Appellant*.


MEMORANDUM OPINION

Appeal from Miami District Court; AMY L. HARTH, judge. Opinion filed March 15, 2019.
Affirmed.

*Paul D. Cramm*, of Overland Park, for appellant.

*Jason A. Vigil*, assistant county attorney, *Elizabeth Sweeney-Reeder*, county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before STANDRIDGE, P.J., PIERRON and GREEN, JJ.


PER CURIAM: Bradley Thomas Gillespie appeals following his convictions of one count each of burglary and theft, four counts of drug possession with intent to distribute within 1,000 feet of school property, and 83 counts of criminal possession of a firearm. For the reasons stated below, we affirm.

FACTS

In the early morning hours of February 2, 2016, law enforcement responded to a security alarm at the AuBurn Pharmacy in Paola, Kansas. Upon arrival, officers observed that the pharmacy's front window was broken and that the inside of the pharmacy was in disarray with shelves knocked over and bottles lying on the ground. Additional inspection revealed that a cabinet used to store Schedule II narcotics was empty. Law enforcement did not observe any suspects leaving the pharmacy and were unable to identify any potential eyewitnesses to the crime. The pharmacy was not equipped with security cameras, and law enforcement recovered no fingerprints or DNA from the crime scene. Officers did, however, discover an ammunition magazine for a PS90 firearm on the ground in the pharmacy's parking lot. Testing revealed no fingerprints or DNA on the magazine.

In an unrelated matter, law enforcement previously executed a search warrant at Gillespie's residence in November 2015, about three months before the pharmacy burglary. During this search, officers located and inventoried 121 firearms. All but one of the firearms were located in various safes throughout Gillespie's residence. Law enforcement took into custody the one firearm found outside the safes, a Firestar semiautomatic handgun, which was found in Gillespie's bedroom. Officers also discovered a box belonging to a PS90 rifle. Law enforcement was not looking for a PS90 firearm at that time, so discovery of the box was not relevant to the search. But the box later became relevant after the pharmacy burglary when law enforcement discovered the PS90 ammunition magazine in the AuBurn Pharmacy parking lot. A PS90 firearm is unique in that it requires a special magazine that lies flat on top of the firearm, unlike most other guns which have magazines that load into the bottom of the firearm.

After the burglary, law enforcement investigated Gillespie for possible illegal gun possession charges. During the course of this investigation, law enforcement identified

Joshua Windler as the previous owner of the Firestar handgun recovered from Gillespie's residence during the November 2015 search. Law enforcement arranged to meet with Windler in March 2016 to inquire how Gillespie had come to possess the weapon. At first, Windler denied giving his gun to Gillespie. Eventually, however, Windler admitted that he had traded it to Gillespie in exchange for drugs. Windler also admitted that Gillespie had instructed him to record the interview with law enforcement and had coached him on what to say. Windler denied having any information about the AuBurn Pharmacy burglary but did say he had noticed an increased amount of drugs at Gillespie's residence after the burglary. Windler said he often observed drug activity at Gillespie's residence and continued to see individuals purchasing drugs from Gillespie after the pharmacy burglary.

As a result of the information provided by Windler, law enforcement executed another search warrant at Gillespie's residence in March 2016 to search for drugs, guns, and stolen property. During the search, officers located a brown bottle believed to be liquid hydrocodone in the garage portion of Gillespie's barn. Although no other drugs were found, law enforcement did discover a hand-drawn map of the AuBurn Pharmacy hidden behind a picture frame in Gillespie's bedroom. Officers also recovered ammunition in a hidden compartment in a coffee table in Gillespie's living room, a box of latex gloves in Gillespie's bedroom, and the 120 firearms from the locked safes. Law enforcement sought and received an arrest warrant for Gillespie, and he was taken into custody the next day.

In August 2016, Jaleh Esfandiary contacted law enforcement to report she had personal knowledge that Gillespie and Joshua David Brown were the individuals who had burglarized the AuBurn Pharmacy. Esfandiary explained that she began dating Gillespie in February 2016 and lived with Gillespie and Brown at Gillespie's residence from March to August 2016. Esfandiary claimed that she knew where Gillespie stored the drugs and that she had information about Gillespie's guns. Esfandiary later provided law

enforcement with photographs of what appeared to be narcotics inside plastic Ziploc baggies, as well as a plastic baggie containing several pills. Esfandiary claimed that these narcotics had been stolen from the pharmacy and were located at Gillespie's residence.

After receiving the information and photographs from Esfandiary, law enforcement arranged a controlled buy in an attempt to purchase all the stolen pills from Gillespie. Esfandiary notified law enforcement that Gillespie and Brown left the residence with the stolen pills and a firearm, apparently headed to the controlled buy. Officers observed Gillespie's truck drive by the meeting location twice before eventually arriving 45 minutes late. Law enforcement arrested Gillespie and Brown but found no drugs or firearms on their persons. Law enforcement obtained another search warrant for Gillespie's residence. During this third search, law enforcement recovered a drug ledger and a firearm inventory.

The State initially charged Gillespie with one count each of burglary and theft and four counts of drug possession with intent to distribute within 1,000 feet of school property. The State later amended the complaint to include 86 additional counts of criminal possession of a firearm. The district court subsequently granted the State's request to dismiss three of the firearm charges.

At trial, the State presented testimony from numerous witnesses, which painted a picture of Gillespie's drug operation and his involvement in the AuBurn Pharmacy burglary. Several witnesses testified that they had purchased drugs from Gillespie or had observed Gillespie selling drugs to others, often in exchange for guns. Julie Scott testified that she had dated and was friends with Gillespie. Scott worked at the AuBurn Pharmacy during the time period when it was burglarized. Scott testified she gave Gillespie information about the pharmacy's security system and told him where certain drugs were located. Scott admitted to drawing the map of the pharmacy that ultimately was

discovered in Gillespie's bedroom and to giving the map to Gillespie in exchange for around $1,000 worth of Adderall.

Several witnesses, including Scott and Esfandiary, testified that Gillespie had told them details about how he and Brown had burglarized the pharmacy and that they had left a firearm magazine at the scene. These witnesses each testified that Gillespie had showed them the drugs he obtained from the burglary and each described how Gillespie stored them. Scott specifically identified hydrocodone, fentanyl patches, Xanax, painkillers, and brown bottles with liquid medications as some of the stolen pharmacy drugs that had been found in Gillespie's possession. Other witnesses testified that after the pharmacy burglary, Gillespie had a large amount of pills and fentanyl patches. Esfandiary testified she personally saw Gillespie selling the stolen drugs. Several witnesses testified that Gillespie, in anticipation of searches by law enforcement, directed his friends to help him move firearms into safes, remove firearms from his property, and destroy or hide other evidence. Witnesses also testified that Gillespie always wore latex gloves when handling the firearms in order to hide his fingerprints.

The jury ultimately found Gillespie guilty as charged. The district court imposed a controlling prison sentence of 308 months and ordered Gillespie to pay restitution in the amount of $3,000 to the AuBurn Pharmacy.

ANALYSIS

Gillespie raises the following points of error on appeal: (1) The district court erred in denying his motion for a new trial based on juror misconduct, (2) the district court erred in denying his motion for judgment of acquittal based on the State's failure to present sufficient evidence to establish the identity of the controlled substances of fentanyl and lisdexamfetamine, (3) the district court erred in denying his motion to sever the firearm charges from the burglary, theft, and drug possession charges, (4) the district

court erred in denying his motion to dismiss the school zone enhancement on his drug possession charges, and (5) the district court erred in allowing the State to introduce witness testimony under the coconspirator exception to the hearsay rule. We address each of these allegations in turn.

1. *New trial*

Gillespie argues the district court erred in denying his motion for a new trial based on juror misconduct. A district court may grant a defendant's motion for a new trial "if required in the interest of justice." K.S.A. 2017 Supp. 22-3501(1). We review the denial of a motion for new trial for an abuse of discretion. *State v. Schumacher*, 298 Kan. 1059, 1069, 322 P.3d 1016 (2014). A district court abuses its discretion if it bases its decision on an error of fact or law or takes a position with which no reasonable person would agree. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011). The party asserting that the court abused its discretion bears the burden of showing such abuse. *State v. Rojas-Marceleno*, 295 Kan. 525, 531, 285 P.3d 361 (2012).

The Sixth Amendment right to a jury trial and the Fourteenth Amendment right to due process guarantee criminal defendants the right to a fair and impartial jury. Juror misconduct can impair this right and result in a fundamental failure in the trial. See *Morgan v. Illinois*, 504 U.S. 719, 727-28, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992); *State v. Corey*, 304 Kan. 721, 732-34, 374 P.3d 654 (2016). Juror misconduct is generally described in situations involving "communications with jurors from outsiders, witnesses, bailiffs, or judges; and actions by jurors in the unauthorized viewing of premises, or reading of newspaper articles." *State v. Fenton*, 228 Kan. 658, 664, 620 P.2d 813 (1980). It can also apply in situations where a juror has deceived the court about his or her familiarity with other jurors, witnesses, the parties, or the facts of the case. See *State v. Jenkins*, 308 Kan. 545, 557-58, 422 P.3d 72 (2018); *State v. Jenkins*, 269 Kan. 334, 338-39, 2 P.3d 769 (2000).

When reviewing claims of juror misconduct, courts use a two-step inquiry to determine if a new trial or declaration of a mistrial is warranted. First, the court must determine "(1) whether juror misconduct occurred, and (2) if so, whether the misconduct substantially prejudiced the right to a fair trial, meaning whether the State can show beyond a reasonable doubt that the misconduct did not affect the trial's outcome." *State v. Longoria*, 301 Kan. 489, 530, 343 P.3d 1128 (2015); see *Bell v. State*, 46 Kan. App. 2d 488, 491, 263 P.3d 840 (2011).

After the jury rendered its guilty verdicts, Gillespie moved for a new trial based on juror misconduct. In his motion, Gillespie alleged that four days after the trial ended, defense counsel received an e-mail from a juror who wanted to share some information about potential jury bias. The juror later submitted the following affidavit:

> "I, [J.M.], do swear to and attest the following statement as true:
>
> "I was recently on the jury for the trial of Bradley Gillespie. There are concerns I have regarding conversations during the breaks and eventually the jury deliberation. While I understand I should have brought this to the Court's attention sooner, I feel as if this could not go unreported as I feel strongly it was inappropriate and against the Jury instructions given. I wish I would have said something at the time.
>
> "There was one juror that let everyone know after the guns were presented that he recognized one of them and it was his, stolen from his truck when he was working near the defendant's home. I am sorry I do not know his name but am certain myself and other jurors could identify him if needed.
>
> "This same juror and one or two others were also heard to be talking about a prior arrest for $200,000 worth of stolen property that they identified as [Gillespie's] 'prior felony.' As the Court knows, the jury was later told that his prior offense was drug related and not in regard to stolen property. I actually did not hear their conversation (or at least enough to note who was discussing this), but was told by another juror who also felt it to be inappropriate and showed they may have had prior knowledge of the defendant.
>
> "I have no way of knowing if it swayed minds, but I felt it important to share. Again, my apologies for not reporting this during the trial, but I honestly could not let this

information continue to go unreported as I am sure I am not the only juror that felt this was inappropriate."

The district court held a hearing on Gillespie's motion. At the end of the hearing, the court expressed doubt about whether any juror misconduct had occurred. Specifically, the court found that J.M.'s statements were irrelevant to the elements necessary to determine Gillespie's guilt. The court noted that the juror who allegedly recognized one of the guns as one stolen from him did not claim that it was Gillespie who stole it. With regard to the alleged statement from a juror that Gillespie's prior felony conviction was for stolen property, the court noted the parties already had stipulated that Gillespie had a prior felony conviction; the fact that the jury may have speculated as to the type of felony conviction was of no consequence. Even if these statements rose to the level of misconduct, the district court found Gillespie suffered no prejudice as a result, given Gillespie's stipulation to a prior felony conviction and the overwhelming evidence presented against him on the criminal possession of a firearm charges. For all of these reasons, the district court denied Gillespie's motion for a new trial.

Relying on the same arguments he made to the district court, Gillespie appeals from the decision to deny his motion for a new trial based on juror misconduct. Gillespie suggests that the statements alleged in the juror affidavit necessarily constituted misconduct because they introduced information into the jury's deliberations that was not admitted into evidence at trial. He also claims that the statements compromised his constitutional right to an impartial jury by suggesting to the jury that a juror was the victim of a crime committed by Gillespie and that Gillespie had a prior arrest for stolen property. Gillespie asserts that had this information been known before or during trial, the jurors making the statements would have been dismissed for cause or replaced with alternate jurors.

The procedure for challenging the validity of a jury's verdict is statutory. Under K.S.A. 60-444(a), a juror is not exempt "from testifying as a witness to conditions or occurrences either within or outside of the jury room having a material bearing on the validity of the verdict . . . except as expressly limited by K.S.A. 60-441." K.S.A. 60-441 prohibits testimony concerning the jury's mental processes:

"Upon an inquiry as to the validity of a verdict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined."

Our Supreme Court has clarified what evidence can be considered under K.S.A. 60-444(a) and what evidence is excluded under K.S.A. 60-441. A verdict may not be impeached by questions concerning a juror's views or conclusions, the reasons for those views or the factors used in determining those conclusions, or what influences those views or the mental process in reaching such conclusions. *Saucedo v. Winger*, 252 Kan. 718, 728-29, 850 P.2d 908 (1993); see also *State v. Cook*, 281 Kan. 961, 977-78, 135 P.3d 1147 (2006) (where juror attested to hearing another juror state that defendant had previously been tried and convicted of same crime, evidence of what other juror said to affiant juror admissible under K.S.A. 60-444[a] but evidence of what effect statement had on affiant's mental process in reaching verdict inadmissible under K.S.A. 60-441); *State v. Kaiser*, 260 Kan. 235, 250-52, 918 P.2d 629 (1996) (where juror attested to being pressured by other jurors to agree to guilty verdict, evidence of what other jurors said and did admissible under K.S.A. 60-444[a] but evidence of what effect conduct had on affiant's mental process in reaching guilty verdict inadmissible under K.S.A. 60-441), *disapproved on other grounds by State v. Gonzalez*, 282 Kan. 73, 145 P.3d 18 (2006).

The statements at issue here involve (1) an opinion by a juror that one of the guns introduced into evidence at trial had been stolen from him and (2) an opinion by jurors

about Gillespie's previous conduct. These statements both involve the subjective thoughts of the jurors and may not be considered because they are evidence of mental processes. See K.S.A. 60-441; *State v. Johnson*, 40 Kan. App. 2d 1059, 1066-67, 198 P.3d 769 (2008).

But even if the jurors' statements could be considered and were found to constitute misconduct, Gillespie is only entitled to relief if the statements substantially prejudiced his right to a fair trial, meaning whether the State can show beyond a reasonable doubt that the misconduct did not affect the trial's outcome. See *Longoria*, 301 Kan. at 530. We conclude the complained of statements did not affect the outcome of Gillespie's trial. Our Supreme Court has found prejudicial juror misconduct when objective evidence not presented at trial was introduced into deliberations. See, e.g., *Barajas v. Sonders*, 193 Kan. 273, 274, 277, 392 P.2d 849 (1964) (juror used slide rule to determine point of impact and other computations in automobile collision case); *Kaminski v. Kansas City Public Service Co.*, 175 Kan. 137, 139, 259 P.2d 207 (1953) (jurors visited scene of collision and measured distances). In contrast, the jurors' statements in this case did not refer to extrinsic evidence that was capable of corroboration. Instead, the statements reflected the jurors' subjective opinions. J.M.'s affidavit does not state that the unnamed juror suspected that Gillespie had stolen his gun. Nor does it contain any information as to when the gun was stolen, how the juror was able to identify the firearm, or whether the juror was even able to definitively identify the firearm as his. Notably, law enforcement specifically testified that none of the firearms recovered from Gillespie's residence had been identified as stolen. As for the statement relating to Gillespie's prior felony, the jurors were merely expressing an opinion about the stipulated fact that Gillespie had a prior felony. The statement did not relate to any contested issue, and there is no indication that it was used for any improper purpose.

Moreover, jurors' statements are not evidence presented in a case, and a jury is instructed to decide the case based on the evidence presented at trial. Here, the district

10

judge specifically instructed the jury about the evidence it could consider in its deliberations: "In your fact finding you should consider and weigh everything admitted into evidence. This includes testimony of witnesses, admissions or stipulations of the parties, and any admitted exhibits. You must disregard any testimony or exhibit which I did not admit into evidence." The judge also instructed the jury that its verdict "must be founded entirely upon the evidence admitted and the law as given in these instructions." "It is well established that juries are presumed to have followed the instructions given by the trial court." *State v. Rice*, 273 Kan. 870, 873, 46 P.3d 1155 (2002); see *Ward*, 292 Kan. at 569-70 (one factor to be considered in assessing prejudice is whether any damage caused by misconduct was removed or mitigated by admonition or instruction).

Finally, a review of the entire record reveals that the evidence overwhelmingly supported Gillespie's convictions. Numerous witnesses testified about Gillespie's admitted involvement in the AuBurn Pharmacy burglary and his possession of guns. The jurors' statements alleged in J.M.'s affidavit did not substantially prejudice Gillespie's right to a fair trial. As a result, the district court did not abuse its discretion in denying Gillespie's motion for a new trial.

## 2. *Insufficient evidence*

Gillespie argues that the district court erred in denying his motion for judgment of acquittal. Specifically, Gillespie contends the State failed to present sufficient evidence to establish the identity of the controlled substances of fentanyl and lisdexamfetamine with respect to the charges of possession with intent to distribute.

In reviewing a district court's decision to deny a defendant's motion for a judgment of acquittal, the appellate court will consider all the evidence in the light most favorable to the State and determine if a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. In doing so, the appellate court will not reweigh the evidence,

11

assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Llamas*, 298 Kan. 246, 254, 311 P.3d 399 (2013); see *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018) (setting forth similar standard of appellate review for challenges to sufficiency of evidence).

In count 2 of the second amended complaint, the State charged Gillespie with possession of fentanyl with intent to distribute within 1,000 feet of school property. In count 4, the State charged Gillespie with possession of lisdexamfetamine with intent to distribute within 1,000 feet of school property. To establish these charges, the State was required to prove, in relevant part, that Gillespie possessed a certain quantity of each of these substances.

At trial, the State presented evidence to show that Esfandiary gave law enforcement a plastic baggie with several pills and a fentanyl patch inside. Esfandiary told law enforcement that the pills and the patch inside the baggie were taken from the pharmacy during the burglary. Law enforcement sent the pills and patch to the Kansas Bureau of Investigation (KBI) for testing. Beth Royel, a KBI forensic scientist, testified that she received this evidence. Royel stated that she visually identified State's Exhibits 4, 6, 7, 12, and 21 as lisdexamfetamine based on the markings on the tablets after referencing the Drug Identification Bible. Royel did not test these exhibits because the lab had no standard with which to compare the substance. Royel identified State's Exhibit 5 as "a commercially-sealed transdermal patch" labeled as fentanyl. Royel explained that the lab does not analyze items that are sealed by the manufacturer and also noted that this particular exhibit was dangerous or hazardous because it appeared to contain fentanyl. On cross-examination, Royel agreed that she could not offer an expert opinion about the compound in State's Exhibits 4, 6, 7, 12, and 21 or what was inside State's Exhibit 5 because she did not perform a chemical analysis on these exhibits.

12

Following the State's case-in-chief, Gillespie filed a written motion for judgment of acquittal. In the motion, Gillespie alleged that the evidence was insufficient to establish that he possessed fentanyl and lisdexamfetamine because the State failed to present a conclusive chemical analysis for those substances. The district court denied Gillespie's motion.

Gillespie notes that controlled substances are illegal based on the specific chemical designations listed in the statutes. See K.S.A. 2017 Supp. 21-5701 et seq. To that end, Gillespie points out the differing classifications and ranges of punishment for distributing or possessing simulated controlled substances versus actual controlled substances. Compare K.S.A. 2017 Supp. 21-5705 and K.S.A. 2017 Supp. 21-5713. Gillespie argues that absent a conclusive chemical analysis, the State cannot establish possession of a controlled substance based on visual identification alone.

But Gillespie provides no authority for his assertion that chemical analysis must be presented in order to prove drug distribution or possession. In fact, Kansas is one of many state and federal jurisdictions to hold that the identity of a controlled substance may be proved by circumstantial evidence where no chemical tests are admitted or available. *State v. Northrup*, 16 Kan. App. 2d 443, 448-49, 825 P.2d 174 (1992); see *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016) (a conviction of even the gravest offense can be based entirely on circumstantial evidence). While chemical analysis is preferable, when it is not available or present, the question of whether the evidence is sufficient is made on a case-by-case basis. *Northrup*, 16 Kan. App. 2d at 456. Circumstantial proof may include evidence of the physical appearance of the substance involved in the transaction. 16 Kan. App. 2d at 453 (quoting *United States v. Dolan*, 544 F.2d 1219, 1221 [4th Cir. 1976]).

A review of the evidence here would allow a reasonable juror to conclude beyond a reasonable doubt that Gillespie possessed fentanyl and lisdexamfetamine. Melissa

13

Gilkison, head AuBurn pharmacist, testified that the pharmacy ordered its drugs from wholesalers that were licensed by the Drug Enforcement Agency (DEA) and through a process set by the DEA. Gilkison stated that the drugs were identifiable by a National Drug Code number on each medication. Gilkison stated that she was confident that the pharmacy's drugs were what they claimed to be based on the standards to which the wholesalers and the pharmacy were held. Gilkison said that she had never experienced a situation in which a drug received by the pharmacy was not what it was claimed to be. The State admitted into evidence an inventory that Gilkison maintained for the pharmacy. The inventory listed the drugs taken during the burglary and included 87 fentanyl patches and 744 lisdexamfetamine capsules. Based on the National Drug Code number on each pill or substance, Gilkison testified that the drugs provided by Esfandiary to law enforcement were consistent with those taken from the pharmacy during the burglary. Gilkison specifically identified State's Exhibit 5 as being consistent with the fentanyl patches stolen during the burglary and State's Exhibits 4, 6, 7, 12, and 21 as each being consistent with the lisdexamfetamine stolen during the burglary. Similarly, Royel identified the lisdexamfetamine capsules by their markings and the fentanyl patch by the manufacturer label. The record contains no evidence to suggest that the substances could have been anything else or that the AuBurn Pharmacy possessed anything other than controlled substances. Although Royel conducted no chemical analysis of the exhibits at issue, the substances that she did test corresponded with Gilkison's identification of the substances taken from the pharmacy. This evidence supports the inference that the pharmacy possessed and sold real controlled substances.

A verdict may be supported by circumstantial evidence, if such evidence provides a basis for a reasonable inference by the fact-finder regarding the fact in issue. *Logsdon*, 304 Kan. at 25. The evidence outlined above, when viewed in the light most favorable to the State, sufficiently demonstrates a rational fact-finder could have found Gillespie guilty beyond a reasonable doubt of possession of fentanyl and possession of

lisdexamfetamine. As a result, the district court did not err in denying Gillespie's motion for judgment of acquittal.

## 3. *Motion to sever*

Gillespie contends the district court erred in denying his motion to sever the firearm charges from the burglary, theft, and drug possession charges.

An appellate court reviews potential joinder errors using a three-step analysis, applying a different standard of review at each step. First, the court determines whether K.S.A. 22-3202 permits joinder. Under that statute, multiple complaints against a defendant can be tried together if the State could have brought the charges in a single complaint. K.S.A. 22-3202(1) establishes the three conditions permitting the joining of multiple crimes in a single complaint: (1) The charges must be of the "same or similar character"; (2) the charges are part of the "same act or transaction"; or (3) the charges result from "two or more acts or transactions connected together or constituting parts of a common scheme or plan." Whether one of these conditions is satisfied is a fact-specific inquiry, and the appellate court will review the district court's factual findings for substantial competent evidence and the legal conclusion that one of the conditions is met de novo. *State v. Ritz*, 305 Kan. 956, 961, 389 P.3d 969 (2017).

Second, because K.S.A. 22-3202(1) provides that charges "may" be joined, a district court retains discretion to deny a joinder request even if a statutory condition is met. Thus, an appellate court reviews the district court's decision for an abuse of discretion. *State v. Hurd*, 298 Kan. 555, 561, 316 P.3d 696 (2013).

Third and finally, if an error occurred in the preceding steps, we determine whether the error resulted in prejudice, i.e., whether the error affected a party's substantial rights. K.S.A. 2017 Supp. 60-261; *Hurd*, 298 Kan. at 561.

15

In its original complaint, the State charged Gillespie with six felony counts related to the pharmacy burglary: four counts of drug possession with intent to distribute and one count each of burglary and theft. The district court subsequently granted the State's motion for leave to amend its complaint to include 86 additional counts of criminal possession of a firearm.

Before trial, Gillespie moved to sever the firearm charges from the burglary, theft, and drug possession charges. Specifically, Gillespie claimed that the firearm charges stemmed from completely separate acts with no common scheme and were not similar enough to warrant joinder. In response, the State alleged that the charges were properly consolidated based on multiple related and connected transactions that constituted parts of a common scheme or plan.

In beginning its analysis to determine whether joinder was proper under K.S.A. 22-3201(a), the district court first held that the crimes were not of the same or similar character. The court went on to find, however, that the charges arguably were part of the same act or transaction:

> "It is possible to argue that the guns found at the residence are related to what the State alleges is an ongoing drug transaction in which the defendant was involved.
>
> "For example, the State has proffered evidence that the defendant was engaged in trading illegal narcotics for . . . guns. What the State cannot show is whether any specific drugs stolen from the pharmacy were traded by the defendant for the specific guns located during the search. However, this type of connection between a distribution charge and the weapons and their acquisition is a connection between the two charges sufficient to support joinder.
>
> "A second support for the premise they were part of the same act or transaction is the presence at the scene of a magazine from a firearm that was the subject of a search during which guns were discovered. The weapon itself was not discovered. However, during a search, a box for a weapon that matched the magazine found at the scene of the burglary was discovered.

16

> "Finally, witnesses for the State, according to the prosecutor's proffer, will testify they received narcotics from the AuBurn burglary and paid for those drugs with firearms."

At the end of its analysis, the judge ultimately concluded that the best support for joinder was the third condition of K.S.A. 22-3202(1):

> "I find these charges are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan. As stated above, the State has proffered evidence in support of its theory that the defendant took guns in trade for illegal narcotics. In fact, several of the guns seized from the defendant's residence and charged in the current Complaint were listed on a spreadsheet detailing the weapon as well as who provided the same to the defendant. Noted about are transactions where the fruits of the burglary resulted in the firearms coming into the defendant's possession.
>
> "The State in its brief briefly touches on the necessity of presenting the evidence of the firearms to support its theory a conspiracy existed between the defendant and a co-defendant as well as between the defendant and his mother. Thus, the evidence of this conspiracy as well as how the defendant acquired the guns may be heard in both the trial of the burglary and possession charges as well as the gun charges. Meaning, the same evidence will be necessary to support all of the charges alleged in the current Complaint.
>
> "Finally, the magazine found at the scene of the burglary provides a sufficient connection between the burglary and the firearms charges."

The district court found that no undue prejudice would result from allowing the charges to be tried together.

Gillespie argues that the district court's ruling was in error, primarily arguing that the firearm charges are not of the same or similar character as the burglary, theft, and drug possession charges. But the district court did not make such a finding. Thus, we need not review whether the crimes were of the same or similar character.

But Gillespie also asserts that the State failed to present sufficient evidence at trial to establish that the crimes were either part of the same act or transaction or resulted from two or more acts or transactions connected together or constituting parts of a common scheme or plan. With regard to whether the charges are connected together or constitute part of a common scheme or plan, Kansas courts have broadly construed the "connected together" language to apply in three situations: (1) when a defendant provides evidence of one crime while committing another, (2) where some of the charges are precipitated by other charges, or (3) when all the charges stem from a common event or goal. *State v. Donaldson*, 279 Kan. 694, 699-700, 112 P.3d 99 (2005). Courts may also join separate crimes that share "factual relationships." See *State v. Woods*, 250 Kan. 109, 116-18, 825 P.2d 514 (1992).

Here, the State presented evidence that Gillespie was involved in a drug distribution operation that existed before and after the pharmacy burglary. The testimony at trial established that Gillespie would commonly exchange drugs for firearms. Esfandiary testified that Gillespie told her that he traded drugs for guns. Windler testified that in June or July 2015, he traded a Firestar M45 semiautomatic pistol to Gillespie in exchange for oxycodone. Dallas Cody testified that he witnessed Gillespie trading guns for drugs and that he personally traded Gillespie firearms in exchange for drugs on two separate occasions prior to March 2016. Kyle Hays testified that he witnessed Gillespie trade drugs for firearms prior to November 2015. Hays also stated that after November 2015, he saw individuals arrive at Gillespie's residence with firearms and then later leave Gillespie's bedroom without the firearms. Finally, Hays said that Gillespie would sometimes keep a drug buyer's firearm as collateral for money owed to him for drugs. This evidence shows that the way Gillespie came into possession of some of his firearms shared a factual relationship with the burglary and drug charges—the acts were done in furtherance of a common scheme or plan to sell drugs. See *Donaldson*, 279 Kan. at 699-700; *Woods*, 250 Kan. at 116-18.

Gillespie disagrees, pointing out that none of the witnesses testified that they traded firearms in exchange for drugs after February 2016 and that the evidence presented at trial did not specifically identify any of the firearms charged in the State's complaint as those traded to Gillespie in exchange for drugs. As a result, Gillespie claims, the alleged exchanges of firearms for drugs could not have been based on the same act or transaction or constituted part of a common scheme or plan involving the AuBurn Pharmacy burglary.

But the State did present evidence suggesting that at least one of the firearms recovered from Gillespie's residence and listed in the complaint was directly connected to Gillespie's drug transactions. The State admitted into evidence a list of firearms found in Gillespie's bedroom during the August 2016 search. Esfandiary testified that Gillespie told her that it was a list of guns that he owned and that he gave the list to her and told her to make sure the police did not find it. The list described each firearm by make, model, action, and caliber. It also detailed the price paid for each firearm and the individual it was purchased from. The list included one firearm purporting to be bought from Cody for $70. This firearm was described as a "Savage 5 Bolt 22." Count 49 of the State's Second Amended Complaint charged Gillespie with criminal possession of a "Savage Model 5 22." Cody testified that one of the firearms he traded to Gillespie in exchange for drugs was a "bolt action 22." Although Cody did not identify any of the firearms at trial as those he traded to Gillespie, the record reflects that Cody was never asked to identify Exhibit 99, the exhibit corresponding to count 49. The only firearm Cody was asked to identify at trial was a shotgun that he claimed he had traded to Brown.

The burglary, theft, and drug possession charges are further connected to the firearm charges given that firearms were used to burglarize the pharmacy. Law enforcement found an ammunition magazine for a PS90 firearm on the ground in the pharmacy's parking lot. During a previous search of Gillespie's residence, law enforcement discovered a box belonging to a PS90 rifle. Multiple witnesses testified that

19

Gillespie had told them details about how he and Brown had burglarized the pharmacy and that they had left a firearm magazine at the scene. The State also presented evidence that Gillespie would often hide or move his drugs and guns in anticipation of law enforcement searches and that he had a firearm when he went to sell drugs to a confidential informant. Finally, law enforcement recovered the firearms Gillespie was charged with illegally possessing during the same search that they discovered evidence of the pharmacy burglary. See *State v. Anthony*, 257 Kan. 1003, 1016-17, 898 P.2d 1109 (1995) (charges for criminal possession of firearm and sale of cocaine properly connected to charges for murder and robbery where firearm discovered during search seeking evidence of murder and robbery). It would have been difficult to introduce evidence relating to the discovery of the firearms without also discussing the pharmacy burglary and Gillespie's drug operation. And many of the witnesses needed to prove the firearm charges were also necessary to prove the burglary, theft, and drug possession charges.

There is substantial competent evidence to support the district court's factual findings that Gillespie routinely traded drugs for firearms or used firearms to facilitate his drug operations. These findings were sufficient to support the court's legal conclusion that Gillespie's two sets of crimes were "connected together or constitut[ed] parts of a common scheme or plan," making joinder permissible under K.S.A. 22-3202(1).

Next, we must review whether the district court's decision to permit joinder under K.S.A. 22-3202(1) was an abuse of discretion. See *Hurd*, 298 Kan. at 561. A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the district court; (2) it is based on an error of law; or (3) it is based on an error of fact. *Ward*, 292 Kan. at 550. Gillespie does not specifically assert that the district court abused its discretion in refusing to sever the firearm charges and no such abuse appears in the record. To the contrary, the district court's comprehensive ruling from the bench demonstrated a careful exercise of discretion. There is no indication that the court's ruling was based on an error of law or fact. And based on the above analysis, we cannot

20

say that the court's ruling was unreasonable. As a result, we find the district court did not abuse its discretion in denying Gillespie's motion to sever.

Because joinder was permissible under K.S.A. 22-3202(1) and the district court did not abuse its discretion in so ruling, the court did not err in denying Gillespie's motion to sever. As a result, we need not address whether Gillespie suffered any prejudice. See *Ritz*, 305 Kan. at 965.

4. *School zone enhancement*

Gillespie argues the district court erred in denying his motion to dismiss the school zone enhancement in counts 1 through 4 for possessing certain controlled substances within 1,000 feet of school property. Specifically, Gillespie challenges the district court's interpretation of K.S.A. 2017 Supp. 21-5705(d)(5), the school zone enhancement. Interpretation of a statute is a question of law over which appellate courts have unlimited review. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015).

The State charged Gillespie in counts 1 through 4 with possessing controlled substances with intent to distribute within 1,000 feet of school property, contrary to K.S.A. 2017 Supp. 21-5705(a)(1). This statute prohibits "distribut[ion] or possess[ion] with the intent to distribute" certain controlled substances. The Legislature imposed an enhanced punishment "if the controlled substance . . . was distributed or possessed with the intent to distribute on or within 1,000 feet of any school property." K.S.A. 2017 Supp. 21-5705(d)(5). Because Paola Middle School is located within 1,000 feet of the AuBurn Pharmacy, the State charged Gillespie under K.S.A. 2017 Supp. 21-5705(d)(5). Prior to trial, Gillespie moved to dismiss the enhancement of counts 1 through 4. The district court denied the motion.

Relying primarily on *State v. Barnes*, 275 Kan. 364, 64 P.3d 405 (2003), Gillespie argues that the school zone enhancement should not apply to his case because he was not arrested or apprehended within 1,000 feet of school property.

In *Barnes*, law enforcement was performing surveillance on several houses where people were known to traffic narcotics when a police officer became suspicious of a nearby car driven by the defendant. The officer followed the car for three to five minutes on a winding route before stopping the defendant in a fast-food parking lot. The defendant's car passed by an elementary school while driving this route. Law enforcement ultimately discovered drugs inside the defendant's car, which resulted in the State charging the defendant with possession of methamphetamine with intent to sell within 1,000 feet of a school zone.

Prior to trial, the district court granted the defendant's motion to dismiss the charge, finding that mere passage through a school zone was insufficient to charge a defendant with a school zone violation. On appeal, the State argued that the defendant was properly charged even if he only passed through the school zone by chance, given the legislative intent in enacting K.S.A. 65-4161(d) (the predecessor to K.S.A. 2017 Supp. 21-5705[d][5]) was to create drug-free school zones. Our Supreme Court affirmed the district court, holding that the Legislature did not intend the statute "to apply to an individual not apprehended within the school zone and where uninterrupted passage in an automobile through the school zone was fortuitous." 275 Kan. at 375.

Gillespie contends that like *Barnes*, the school zone enhancement does not apply in his case because the location of the AuBurn Pharmacy was merely fortuitous. To that end, Gillespie notes that he was not arrested or apprehended within 1,000 feet of school property and law enforcement did not discover any drugs at a location within 1,000 feet of school property.

22

But *Barnes* "is a narrow holding based upon unique facts" and is therefore distinguishable. 275 Kan. at 375. Unlike *Barnes*, this case does not involve a situation in which Gillespie just happened to drive or pass through an area while in possession of the drugs. Instead, the evidence at trial established that AuBurn Pharmacy is located within 1,000 feet of Paola Middle School, that Gillespie intentionally entered the school zone with the intent to possess certain controlled substances for distribution, and that Gillespie came to possess the controlled substances when he stole them from the pharmacy and while he was within 1,000 feet of the school. Moreover, possession with intent to distribute within 1,000 feet of school property is a strict liability crime. In other words, the State was not required to prove Gillespie knew that the pharmacy was located within the school zone. See *Barnes*, 275 Kan. at 373 ("[P]ossession of the required quantity of drugs within 1,000 feet of a school and an intent to distribute the drugs somewhere is all that must be proved to support a conviction.") (citing *United States v. Harris*, 313 F.3d 1228, 1239 [10th Cir. 2002]). The fact that law enforcement did not apprehend Gillespie within the school zone is irrelevant because he possessed the controlled substances at issue while in the school zone.

The *Barnes* court recognized that the Legislature imposed the enhanced penalty to promote "drug-free zones" around schools. 275 Kan. at 370. There is no indication that the Legislature had a different objective when it recodified the enhancement in K.S.A. 65-4161(d). See *State v. Brooks*, No. 113,636, 2017 WL 839793, at *12 (Kan. App.) (unpublished opinion), *rev. denied* 306 Kan. 1321 (2017). Gillespie's conduct involved intentional criminal acts within the school zone, not incidental contact. Specifically, Gillespie purposefully traveled to the pharmacy, which was located within 1,000 feet of a school, and then intentionally acquired possession of the controlled substances with the intent to distribute them. This factual situation is equivalent to an individual who purposefully travels to a location within 1,000 feet of a school to purchase a controlled substance with the intent to distribute it. In both instances, the transaction took place within 1,000 feet of a school. The fact that he stole the controlled substance instead of

23

purchasing it is of no consequence to whether the school zone enhancement applies. For the reasons stated above, the district court did not err in denying Gillespie's motion to dismiss the school zone enhancement of his drug possession charges.

5. *Coconspirator exception to hearsay rule*

Gillespie argues the district court erred in allowing the State to introduce the testimony of a witness under K.S.A. 2017 Supp. 60-460(i)(2), the coconspirator exception to the hearsay rule. Gillespie claims that permitting the State to introduce this evidence violated his constitutional right to confront witnesses.

We review a district court's determination regarding whether hearsay is admissible under a statutory exception for an abuse of discretion. *State v. Betancourt*, 301 Kan. 282, 297, 342 P.3d 916 (2015). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the district court; (2) it is based on an error of law; or (3) it is based on an error of fact. *Ward*, 292 Kan. at 550.

Hearsay is evidence of a statement made by someone other than a testifying witness that is offered to prove the truth of the matter stated. Hearsay evidence is generally inadmissible. K.S.A. 2017 Supp. 60-460. But this general rule is subject to several exceptions, including an exception for statements of coconspirators made during and in furtherance of the conspiracy. K.S.A. 2017 Supp. 60-460(i)(2). If applicable, the exception allows otherwise relevant and admissible out-of-court statements of one coconspirator to be admitted in a trial of a second coconspirator.

To take advantage of this exception, the State must offer some trial evidence apart from the hearsay statements themselves to show the existence of a conspiracy. *State v. Butler*, 257 Kan. 1043, 1060, 897 P.2d 1007 (1995), *modified on reh'g* 257 Kan. 1110, 916 P.2d 1 (1996). The independent evidence of the conspiracy then triggers the hearsay

24

exception. The discussions of the coconspirators in arriving at the scope and terms of their illegal confederation are considered verbal acts and, therefore, not hearsay at all. *United States v. Faulkner*, 439 F.3d 1221, 1226-27 (10th Cir. 2006). Once the prosecution has made a prima facie showing of both a conspiratorial agreement and an overt act using nonhearsay evidence, it may then rely on the hearsay exception to introduce evidence of communications among the participants for the truth of the matters asserted to prove details about the promotion and advancement of the agreement. See *State v. Davey*, 306 Kan. 814, 822, 397 P.3d 1190 (2017).

Before trial, the State moved for permission to introduce certain evidence of a conspiracy between Gillespie and Brown to steal drugs and sell them in exchange for money or weapons. This evidence included Brown's statements and acts relevant to the conspiracy. In response, Gillespie alleged that the State had not provided sufficient proof of the conspiracy independent of the hearsay itself. The district court granted the State's motion, finding that the proffered evidence set forth in the State's motion constituted sufficient evidence of a conspiracy. The court noted that it would be forced to reconsider its ruling if the State was unable to present the proffered testimony into evidence at the time of trial. At trial, defense counsel objected to the State's attempts to introduce the challenged hearsay, and the district court later granted defense counsel's request for a continuing objection to the introduction of this evidence.

On appeal, Gillespie argues that the evidence of a conspiracy proffered by the State in its motion merely expounded upon the hearsay statements that it intended to offer at trial without presenting any independent proof of the conspiracy between himself and Brown.

Contrary to Gillespie's argument, the State presented the following evidence at trial to support the existence of a conspiracy between Gillespie and Brown, separate from the hearsay statements themselves. Brown lived with Gillespie at the time of the

25

pharmacy burglary and witnesses described them as close friends who were often together. Esfandiary, who started dating Gillespie and moved into his residence shortly after the burglary, testified that she helped Gillespie and Brown count the stolen pharmacy drugs on several occasions. Esfandiary claimed Gillespie and Brown had agreed that Gillespie would sell the drugs and Brown would get 25% of the profits. Several witnesses testified that Brown would help Gillespie sell drugs if Gillespie was unavailable. Brown sold Adderall to a confidential informant in May and June 2016. Brown helped Gillespie conceal or move drugs and firearms in anticipation of law enforcement searches. Brown was present when Gillespie mentioned that he wanted to break into the AuBurn Pharmacy and when Gillespie coached other witnesses on what to tell law enforcement. Brown was with Gillespie when he arrived at the meeting location during law enforcement's attempt to purchase the stolen pills. Moreover, several witnesses testified that Gillespie admitted that he and Brown had burglarized the AuBurn Pharmacy. Such statements are independently admissible as a confession or party admission under K.S.A. 2017 Supp. 60-460(f) and (g).

The State presented substantial competent evidence to establish that Gillespie and Brown participated in a drug distribution conspiracy that involved burglarizing the AuBurn Pharmacy and selling the stolen drugs and that Brown played a vital role in helping Gillespie acquire, hide, and distribute the stolen drugs. See *State v. Sharp*, 289 Kan. 72, ¶ 15, 210 P.3d 590 (2009) (formal agreement not required to constitute conspiracy; "it is enough if the parties tacitly come to an understanding in regard to the unlawful purpose, and this may be inferred from sufficiently significant circumstances"). Thus, the district court did not abuse its discretion in finding that the State met its burden of establishing the existence of a conspiracy between Gillespie and Brown and that the hearsay evidence at issue was admissible under K.S.A. 2017 Supp. 60-460(i)(2).

Finally, Gillespie suggests that allowing the State to introduce this evidence violated his constitutional rights under the Confrontation Clause. Whether an evidentiary

26

ruling violated a defendant's constitutional rights is reviewed de novo on appeal. *State v. Jones*, 306 Kan. 948, 961, 398 P.3d 856 (2017).

A witness' testimonial statements against a defendant are inadmissible unless the witness appears at trial or, if the witness is unavailable to testify at trial, the defendant had a prior opportunity for cross-examination. If the statements are nontestimonial, however, the Confrontation Clause guarantees are not implicated. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Statements by coconspirators are not testimonial and therefore do not implicate the Confrontation Clause. 541 U.S. at 55-56; *Jones*, 306 Kan. at 961. Here, the statements at issue are not testimonial because they were made by a coconspirator. As a result, Gillespie's claim that his right to confrontation was violated necessarily fails.

Affirmed.