NOT DESIGNATED FOR PUBLICATION

No. 124,834

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SHARDELL SHAKUR JACKSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; CHERYL A. RIOS, judge. Oral argument held July 11, 2023. Opinion filed February 9, 2024.  Affirmed.

*Catherine A. Zigtema*, of Zigtema Law Office, LC, of Shawnee, for appellant.

*Michael R. Serra*, deputy district attorney, *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before HILL, P.J., HURST, J., and TIMOTHY G. LAHEY, S.J.

HURST, J.:  A jury found Jackson guilty of attempted first-degree premeditated murder, criminal possession of a weapon, and criminal discharge of a firearm at an occupied dwelling after a drive-by shooting. Jackson alleges that improper prosecutorial statements and the district court's erroneous refusal to allow him to play a video about unconscious bias during voir dire breached constitutional safeguards and thus deprived him of a fair trial. Contrary to his contentions, this court finds the majority of Jackson's complaints unavailing and that any errors were individually and cumulatively harmless. Jackson's convictions are therefore affirmed.

1

On March 8, 2020, a white vehicle approached the victim, K.A., while he walked home. After a verbal exchange between K.A. and the vehicle's occupants, one of the occupants shot him. Surveillance cameras in the area captured the shooting on video. Shortly after the shooting, K.A. identified his shooter as "Shugg"—which is a known alias for Jackson—as the shooter.

The State first charged Jackson with one count each of aggravated battery, criminal discharge of a firearm at an occupied dwelling, and criminal possession of a weapon. Following some preliminary hearings, the State amended the complaint and added one count of attempted first-degree premeditated murder as an alternative to the aggravated battery charge and dismissed the criminal-possession-of-a-weapon charge.

*Testimony Regarding the Make of the Car*

At the preliminary hearing, a Topeka Police Department detective who participated in the investigation testified that the vehicle captured on the surveillance footage was determined to be a 2002 Mercedes. Prior to trial, Jackson moved to suppress testimony by law enforcement that "would attempt to identify the make and model of a vehicle in any photographs or video surveillance as a Mercedes," arguing that the testimony would constitute improper opinion testimony under K.S.A. 2022 Supp. 60-456(a). The district court denied the motion, explaining:

> "I believe that the detective can testify as to what he observed, what he saw . . . .
>
>     . . . .
>
>     "[The detective] can testify as to all of those things that he saw and did related to his investigation. Those are all facts that he can testify to.

". . . [The detective] can testify as to all of the things that he saw and observed. I think he can testify that he believes it's the same motor vehicle. And counsel for the defense can cross-examine as to the strength of his belief. But I think that it is fair game for him to testify, given all of the facts that he has in addition to the investigation that informed his ultimate belief, that it was the same car that was driving. And also the same car at the defendant's grandmother's address.

"So I believe that he can testify as to all of the things that he saw, all of the things that he did. I think he can testify that it is his belief that it was the same vehicle. And counsel can cross-examine him as to the, you know, the strength of that belief and that can be tested in front of the jury."

*The Unconscious Bias Jury Video*

Jackson also filed a pretrial motion requesting that all prospective jurors be shown an approximately 11-minute-long video addressing unconscious bias: *Understanding the Effects of Unconscious Bias*. The video was created by a committee of judges and attorneys from the United States District Court for the Western District of Washington. According to the video's creators, the purpose of presenting the video to jurors is "highlighting and combating the problems presented by unconscious bias." See United States District Court for the Western District of Washington, https://www.wawd.uscourts.gov/jury/unconscious-bias.

Jackson argued it was necessary to play the video to all prospective jurors because:

"People of color, particularly African Americans [*sic*] males, are sometimes treated unfairly in the criminal justice system. Statistics shows [*sic*] that African American [*sic*] are sentenced more frequently to prison, they receive higher prison sentences and bail amounts when comparing white defendants that commit [a] similar offense, especially when the offense is one of violence by a black defendant. The inequities in our justice system occur due to biases.

. . . .

"Defense counsel understands that she can explore issues of race without the presentation of [the video]. But, she believes the video should be presented through a neutral process, as she has witnessed and personally experienced implicit bias and microaggressions while practicing in Shawnee County. So it stands to reason that individuals, like prospective jurors, even with their best intentions may use unconscious actions against the defendant or his counsel if they are not made aware of their predilections."

Jackson further argued that presenting the video to prospective jurors would "not cause harassment or delay" and that the video would present general information about bias and impartiality and would not be repetitive.

The State opposed Jackson's request and argued that the "question of racial bias is best addressed" in direct questioning by counsel "where jurors can respond and interact with counsel" rather than through a static video. The district court ultimately denied Jackson's motion, explaining:

"The Court believes that it is important during voir dire for the parties to address any bias, and all bias, of potential jurors. And the Court believes that it is an effective way, or can be an effective way to accomplish that through individual, by the attorneys, questioning jurors with regard to those potential biases.

"And at this point, I'm not believing that the video that has been presented would necessarily help the jury in coming to that conclusion any better than defendant's own ability to question and voir dire candidates for the jury. So therefore, the motion to present a video during orientation during this particular trial is denied."

Jackson directly questioned potential jurors about bias during voir dire.

*Evidence Presented Supporting Jackson's Conviction*

In his trial testimony, K.A. identified the defendant as the shooter and testified that he and the defendant had a prior altercation. Moreover, a detective involved in the investigation testified at trial about how he determined that the white car captured on the surveillance footage was the same white car found outside the defendant's residence. After the jury was shown the surveillance footage and a picture of the car found outside the defendant's residence, the detective explained that the two cars had the same sunroof, rounded headlights, rims, tail lights, brake lights, antenna mount, and rust lines. Another officer testified that during a search of the car found outside the defendant's residence, an officer discovered a handgun in the glovebox. A forensic scientist with the Kansas Bureau of Investigation (KBI) testified that the major DNA profile obtained from the swab of the handgun was consistent with the known DNA profile of the defendant. A firearms and toolmark examiner with the KBI also testified that the fired shell cartridges recovered from the crime scene were fired from the handgun discovered in the car outside the defendant's residence.

*Verdict*

After hearing all the evidence, the jury convicted Jackson on all counts. The district court vacated the sentence for the alternative charge of aggravated battery and imposed the presumptive prison sentence on the two remaining charges to run concurrently, resulting in a controlling prison term of 253 months. Jackson appeals.

DISCUSSION

Jackson makes two overarching claims of reversible error: First, prosecutorial error during voir dire, opening statement, and closing argument deprived him of a fair

trial; and second, the court's refusal to show the jury a video about unconscious bias deprived him of a fair trial. Each claim is addressed in turn.

I.    PROSECUTORIAL ERROR DID NOT DEPRIVE JACKSON OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL

"The right to a fair trial is a fundamental liberty secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *State v. Sherman*, 305 Kan. 88, Syl. ¶ 1, 378 P.3d 1060 (2016). Jackson alleges the prosecutor committed reversible error by (1) improperly eliciting sympathy from the jury; (2) violating in limine orders; (3) misstating the law; (4) stating personal opinion on evidence; and (5) improperly arguing facts not in evidence.

Jackson failed to contemporaneously object to any of the allegedly erroneous prosecutorial statements, but that failure does not preclude appellate review of such alleged errors. However, on appeal, this court may "figure the presence or absence of an objection into [its] analysis of the alleged error." *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021). This court applies "a two-step analysis to evaluate claims of reversible prosecutorial error. These two steps can and should be simply described as error and prejudice." *Sherman*, 305 Kan. 88, Syl. ¶ 6. First, this court determines whether the allegedly erroneous statements "fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *Sherman*, 305 Kan. 88, Syl. ¶ 7. In the second step, if an error is found, this court must "determine whether the error prejudiced the defendant's due process rights to a fair trial." 305 Kan. 88, Syl. ¶ 7. Prejudice is evaluated using the constitutional harmlessness test under which "[p]rosecutorial error is harmless if the State proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire

6

record, i.e., where there is no reasonable possibility that the error contributed to the verdict." *Sherman*, 305 Kan. 88, Syl. ¶ 8.

a. *The prosecutor's comments during voir dire about "people that were affected by the crime" were not error.*

Jackson claims that the prosecutor committed reversible prosecutorial error by improperly eliciting sympathy from the jury during voir dire in the following exchange:

"[Prosecutor]: We've been hearing about, quite a bit about, how important it is to have a fair and impartial jury in this case. Can anyone tell me why they think that's important for the defendant?

"[Prospective Juror N.]: It's the right thing to do.

. . . .

"[Prosecutor]: To be fair?

"[Prospective Juror N.]: That's what America's about.

"[Prosecutor]: Okay. Why might that be important for the defendant?

"[Prospective Juror N.]: He is part of America.

"[Prosecutor]: He's entitled to a fair trial?

"[Prospective Juror N.]: Absolutely.

"[Prosecutor]: What about for the State, do you think it's important for the State to have a fair trial?

"[Prospective Juror N.]: They have to prove him wrong.

"[Prosecutor]: Why do you think it's important for the State to have a fair trial?

"[Prospective Juror N.]: For society.

"[Prosecutor]: *Maybe people that were affected by the crime?*

"[Prospective Juror N.]: They are part of society.

. . . .

"[Prosecutor]: I think we can all understand why it's important for the defendant to have a fair trial and fair jurors. But does everybody understand that it's equally important for the State to have fair jurors and a fair trial?

"I'm sorry, ma'am, Ms. [L.]?

7

"[Prospective Juror L.]: Yes. I feel like the State, it's basically for the victims of the crime. It is for their justice as well. So . . .

"[Prosecutor]: *Sure. Yeah*. Does anybody think that this case is more important for the defendant than it is for the State?

. . . .

"[Prospective Juror B.]: I think it's equal. I think that both parties, the parties on either side, you know, it's important for justice to be served for both their benefit or whether they have to pay for something." (Emphases added.)

Jackson claims that these statements "conflated the State with crime victims to engender sympathy with the jury" and "impermissibly attempt[ed] to elicit sympathy for victims to their benefit." Jackson further argues that the State sought to "benefit from sympathy towards victims by implying consideration of victims is part of fair treatment of the State."

It is prosecutorial error to ask the jury to convict a defendant to seek justice for the victim. *State v. Schumacher*, 298 Kan. 1059, Syl. ¶ 6, 322 P.3d 1016 (2014). It is also error for a prosecutor to ask the jury "to render a verdict to protect the community." *State v. Finley*, 273 Kan. 237, 245, 42 P.3d 723 (2002). However, the prosecutor here was not asking the jury to return a verdict at all—much less a verdict based on justice, sympathy, or community protection. These statements occurred during voir dire—the process of questioning jurors before they are empaneled—long before requesting a particular verdict. Although a prosecutor always wants the jury to return a particular verdict, the context and timing of these questions did not relate to deliberation. Moreover, the prosecutor's statements were made in the context of discussing with potential jurors their view of a fair trial and were unrelated to the specific facts of the case or a verdict.

While the Kansas Supreme Court has held that "a prosecutor's argument regarding the impact of a crime on a victim or a victim's family may constitute reversible error because it diverts attention from the evidence and law," that is not what happened here.

8

*State v. Holt*, 300 Kan. 985, 993-94, 336 P.3d 312 (2014). Rather, the prosecutor was talking about fairness to both the State and the defendant, and the overall purpose of a trial—which included fairness to people affected by the crime. This is dissimilar to instances when a prosecutor specifically states, for example, that the trial "'is the only chance [the murder victim] will ever have to have someone held accountable for taking his life.'" *State v. Adams*, 292 Kan. 60, 67-68, 253 P.3d 5 (2011). In *Adams*, the prosecutor's statements were connected to eliciting sympathy for the victim to obtain a guilty verdict. That is not the case here, and the statements during voir dire were not error.

b. *The prosecutor's comment during opening statement that "officers saw the white car from the video parked outside the residence" was not reversible error.*

Jackson alleges the prosecutor included inappropriate opinion testimony that the white car seen in the video was the same car parked outside Jackson's residence. A Topeka Police Department detective who participated in the investigation testified at the preliminary hearing that it was impossible to tell the make and model of the white vehicle from the surveillance footage alone. However, through their investigation, the police determined the vehicle was a 2002 Mercedes. Prior to trial, Jackson moved to suppress testimony by law enforcement that "would attempt to identify the make and model of a vehicle in any photographs or video surveillance as a Mercedes," arguing that because the make of the vehicle was not apparent from the video, their testimony would constitute improper opinion testimony under K.S.A. 2022 Supp. 60-456(a). The district court denied the motion and permitted testimony about the officers' conclusions from their investigation, explaining:

> "[The detective] can testify as to all of the things that he saw and observed. I think he can testify that he believes it's the same motor vehicle. And counsel for the defense can cross-examine as to the strength of his belief. But I think that it is fair game for him to testify,

9

given all of the facts that he has in addition to the investigation that informed his ultimate belief, that it was the same car that was driving. And also the same car at the defendant's grandmother's address. . . .

"So I believe that he can testify as to all of the things that he saw, all of the things that he did. I think he can testify that it is his belief that it was the same vehicle. And counsel can cross-examine him as to the, you know, the strength of that belief and that can be tested in front of the jury."

Jackson now argues on appeal that the prosecutor committed error by violating the district court's order in limine and stating his personal opinion on controverted evidence in the following sentence of his opening statement: "When the officers got to his house, this was a few hours after the shooting had taken place, *officers saw the white car from the video parked outside of the residence*." (Emphasis added.)

The prosecutor's statement was not exactly in line with the district court's direction. Rather than saying the officer saw what the officer *believed* to be the car from the video, the prosecutor's statement was more definitive. The statement made it appear that it was an undisputed fact that the car from the video was the car parked outside the residence. However, some may argue that the prosecutor's statement fit the purpose of an opening statement to "'assist the jury in understanding what each side expects its evidence to establish and to advise the jury what questions will be presented for its decision.'" *State v. Chandler*, 307 Kan. 657, 685, 414 P.3d 713 (2018) (quoting *State v. Love*, 305 Kan. 716, 728, 387 P.3d 820 [2017]). Because the evidence was strong that the white car on the video was the same car officers saw outside Jackson's residence, this statement could be viewed as outlining what the State intended to prove.

Even if the statement was error, it was individually harmless and far from reversible error. "In determining whether a particular statement falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation." *State v. Ross*, 310 Kan. 216, Syl.

10

¶ 1, 445 P.3d 726 (2019). Context is considered when determining both error and harmlessness. See, e.g., *State v. Brown*, 316 Kan. 154, 170-72, 513 P.3d 1207 (2022). The prosecutor began his opening statement by explaining, "The purpose of this opening statement is to describe what the evidence in this case is going to show. . . . [T]his is a chance for me and the defense to tell you what we believe the evidence is going to show." Before the prosecutor's challenged statement, he repeatedly emphasized that he was outlining what he expected the forthcoming evidence to prove, including in the following statements: "So the evidence in this case is going to show," and "you are going to hear evidence," and "the evidence will show." The prosecutor's full opening statement demonstrates that the portion to which Jackson objects was part of the prosecution's description of what it intended to prove. The defense was also able to present evidence throughout the trial that challenged the identification of the vehicle. For example, Jackson's attorney cross-examined the detective about his belief that the vehicle captured on the surveillance footage was the same vehicle found outside Jackson's residence and whether the detective investigated how many other cars in the area also shared the identified characteristics of the car in the surveillance footage. There was therefore no confusion that Jackson disputed the detective's identification of the white vehicle in the video as the same vehicle parked outside his residence.

Moreover, the prosecutor's explanation that "the statement that the lawyers make up here for the opening statement is not evidence itself" also mitigated any potential prejudice from the statement. The jury knew not only that the statements were intended to show what the State expected to prove but also that the prosecutor's statements were not themselves evidence, and this court presumes the jury followed those instructions. *Brown*, 316 Kan. at 170. Finally, the overall strength of the State's case demonstrates that there was "no reasonable possibility that the error contributed to the verdict," as explained more fully below. *Sherman*, 305 Kan. 88, Syl. ¶ 8 ("Prosecutorial error is harmless if the State proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there

11

is no reasonable possibility that the error contributed to the verdict."). The prosecutor's statement, even if error, was harmless.

c. *The prosecutor did not misstate the law regarding what is necessary to prove attempted first-degree premeditated murder.*

Jackson claims the prosecutor misstated the law regarding what is necessary to prove attempted first-degree premeditated murder in the following excerpt from his closing argument:

"*An attempt means that the defendant made an overt act towards the commission of the completed crime*. For that count, the completed crime would be first degree murder.

"First degree murder—the instruction then gives you the definition of that completed crime at the bottom. It means that it's the killing of another person, intentionally and with premeditation. *So for that count, the State must prove that the defendant committed an overt act towards the killing of [K.A.], and that he acted intentionally and with premeditation.*

. . . .

"The evidence in this case shows beyond a reasonable doubt that the defendant, Shardell Jackson, *did do an over*[*t*] *act towards the commission of first degree murder.* He acted intentionally and he acted with premeditation." (Emphases added.)

"A prosecutor's clear misstatement of law constitutes prosecutorial error." *Ross*, 310 Kan. 216, Syl. ¶ 2. A conviction for an attempted crime under K.S.A. 2019 Supp. 21-5301(a) requires the State to prove the defendant had the specific intent to commit the underlying crime. *State v. Mora*, 315 Kan. 537, Syl. ¶ 1, 509 P.3d 1201 (2022). "An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 2019 Supp. 21-5301(a).

Jackson appears to claim the prosecutor misstated the law because he did not explicitly say that the State was required to prove that Jackson performed the overt act with the specific intent to commit *first-degree premeditated murder* rather than the "completed crime" or "killing":

> "The State does not simply need to prove that the defendant 'committed' an act toward a 'killing.' In the attempt to combine the two sets of statutory elements, the State misstates the law. The result misleads the jury on the specific intent necessary for the offense and leaves the impression that a general act towards a killing is sufficient to meet the State's burden for attempted first degree premeditated murder. It confuses the intent necessary for the overt act."

Although the prosecutor's explanation could have been more complete or methodical, the summary does not misstate the law. The prosecutor included the essential elements of the crime and explained that the State was required to prove that Jackson committed an overt act toward the "completed crime" and then went on to explain that the "completed crime" was first-degree premeditated murder. The prosecutor then explained that the jury instruction included the definition of first-degree murder and—rather than read the definition verbatim—he summarized it as requiring the State to prove Jackson "*acted intentionally and with premeditation*" in the overt act. (Emphasis added.) This is an accurate summary of the elements of first-degree premeditated murder. K.S.A. 2019 Supp. 21-5402(a)(1). While the prosecutor did not recite the jury instruction verbatim, the prosecutor directed the jury to the written definition and summarized the elements, including specific intent.

Moreover, when examined in context, the prosecutor referenced and directed the jurors to the specific, accurate jury instruction. To the extent the prosecutor's summary caused confusion because it was not in the exact order or language of the jury instruction, such confusion was resolved by the context with the prosecutor's reference to the full jury instruction. See *Ross*, 310 Kan. 216, Syl. ¶ 1 (courts analyze prosecutorial error in

13

context). The prosecutor did not misstate the law when describing the elements of the charged crime.

d. *The prosecutor did not state his personal opinion on controverted evidence during his closing argument.*

Jackson claims the prosecutor erred during his closing argument by stating his personal opinion on controverted evidence in the following statement: "So we know from the first-hand eyewitness, the person who got shot, has testified that this defendant is the person that shot him." A prosecutor stating their personal opinion about controverted facts, particularly using "'we know'" statements, can constitute error, but that did not occur here. See *Brown*, 316 Kan. at 165. The prosecutor did not say, "We know that this defendant is the person who shot the victim." Rather, the prosecutor said, "[W]e know from the first-hand eyewitness, the person who got shot, *has testified* that this defendant is the person that shot him." (Emphasis added.) Simply using the phrase "we know" does not turn an uncontroverted fact into an opinion. Here, the victim testified that while he was walking, a car pulled up and an occupant—who the victim identified as "Shugg"—hollered at him from the car and eventually shot him. The victim further testified that "Shugg" was the defendant in the courtroom. The prosecutor's statement, although it included the phrase "we know," did not constitute personal opinion and was not made in error.

e. *The prosecutor did not improperly argue facts not in evidence during his closing argument.*

Jackson claims the prosecutor committed error in his closing argument by arguing facts not in evidence to prove premeditation in the following excerpt:

14

"No matter what [K.A.]'s response was, the defendant was going to pull that gun. He was ready to do that. He didn't need any provocation.

"Think about where the gun must have been before the shots rang out. [K.A.] didn't do anything that would provoke the defendant to, like, reach for the gun and grab it, you know, some aggressive action or something. He had it ready. No matter what [K.A.] did, these shots were coming at him."

"A prosecutor falls outside the wide latitude afforded the State in conducting its case when he or she . . . argues a fact or factual inference with no evidentiary foundation." *State v. Watson*, 313 Kan. 170, Syl. ¶ 3, 484 P.3d 877 (2021). It is also prosecutorial error to comment on facts not in evidence. *State v. Stimec*, 297 Kan. 126, 128, 298 P.3d 354 (2013). However, "[i]n closing argument, the prosecutor may draw reasonable inferences from the evidence but may not comment upon facts outside the evidence." *State v. Hall*, 292 Kan. 841, Syl. ¶ 3, 257 P.3d 272 (2011).

Once again, this court does not review the prosecutor's statements in isolation but examines the entire context of the statement. *Ross*, 310 Kan. 216, Syl. ¶ 1. The prosecutor's statement about premeditation was preceded and surrounded by facts of the incident and the timeline used to show premeditation:

"The evidence of premeditation in this case is this, the defendant pulled up in the white car as [K.A.] was walking down the sidewalk, called out to him, asked if he had a problem. Did [K.A.] do anything to the defendant? Did [K.A.] provoke him in any way? No, he didn't. He was walking home from the store.

"The evidence indicates that the defendant knew as he called out to him what [he] was going to do. He didn't need [K.A.] to provoke him to do anything. No matter what [K.A.]'s response was, the defendant was going to pull that gun. He was ready to do that. He didn't need any provocation.

"Think about where the gun must have been before the shots rang out. [K.A.] didn't do anything that would provoke the defendant to, like, reach for the gun and grab

15

it, you know, some aggressive action or something. He had it ready. No matter what [K.A.] did, these shots were coming at him."

The prosecutor made the challenged statement after first stating that he planned to outline the evidence of premeditation. He then explained the uncontroverted facts that supported the conclusion that the defendant acted with premeditation. The prosecutor's statement demonstrates that the State was relying on the list of recited, uncontroverted facts to prove premeditation. "A prosecutor is given wide latitude in the language and the manner of presentation of closing argument as long as the argument is consistent with the evidence." *Hall*, 292 Kan. 841, Syl. ¶ 4. The prosecutor's comments here do not present new evidence but constitute argument related to the evidence presented. The victim testified that he did not approach the shooter, attack or act aggressively toward the shooter, threaten the shooter, or take any other action to precipitate the shooting. The prosecutor's statement was essentially a summary of that evidence, and the defense did not argue that the victim's actions caused him to be shot.

f. *The prosecutor's personal opinion during rebuttal did not constitute reversible error.*

In his last claim of prosecutorial error, Jackson claims the prosecutor erred in his rebuttal by stating his personal opinion that there could be only one person who fit the description of the assailant here. The challenged statement was, "[h]ow many people fit that description? I'll tell you how many. One, the defendant." In context, the prosecutor said:

"Now, are there more than one black male with curly hair and glasses in Topeka? Absolutely. But, I would ask you this, how many black males with curly hair and glasses that go by the name of 'Shugg' that drive a four-door white car with tinted windows, rust along the side, who happened to be in possession of the gun that had just fired 12 shots at [K.A.] four hours before that, and whose DNA happens to be the major profile on that

16

gun, and who also happened to be hanging out with somebody who matched the description of the passenger that [K.A.] saw? How many people fit that description? *I'll tell you how many. One, the defendant*." (Emphasis added.)

Jackson argues that the last line of this excerpt constituted an improper statement of personal opinion on the evidence.

In context, the prosecutor's final statement was an inference that was reasonably drawn from the uncontroverted evidence. See *Hall*, 292 Kan. 841, Syl. ¶ 3. But it also cannot be ignored that the statement—no matter how reasonable—was the prosecutor's opinion and was not based on uncontroverted evidence because Jackson disputed the conclusion that he was the shooter. "[A] prosecutor's wide latitude does not extend to announcing the prosecutor's opinion on issues for the jury, including the defendant's guilt or innocence or witness credibility." *State v. Alfaro-Valleda*, 314 Kan. 526, 538, 502 P.3d 66 (2022). Just as use of a "we know" statement does not automatically constitute prosecutorial error, nor does its omission in the context of a blatant opinion mean there was no error. The Kansas Supreme Court has suggested use of phrases such as "'the evidence shows'" or "'I submit'" help to make an inferential statement less subjective. *Alfaro-Valleda*, 314 Kan. at 538. Here, the prosecutor did not avail himself of any such phrases to alleviate the subjectivity of his conclusion.

Assuming that the prosecutor's statement that Jackson was the only person who met the narrow description of the assailant was an improper opinion—no matter how reasonable the inference—this court must determine whether Jackson was prejudiced by the error. See *Sherman*, 305 Kan. 88, Syl. ¶ 7. Once again, this court reviews the context of the statement, any mitigation, and the overall strength of the case to determine whether the prosecutor's erroneous statement was harmless. *Brown*, 316 Kan. at 170-72. The context here was a prosecutor's reasonable conclusory statement made after reciting a litany of uncontroverted facts supporting the conclusion. The prosecutor's statement was

17

not repetitive or thematic and was not out of context. Additionally, and as described below, the district court mitigated any potential error, and the overall strength of the case persuades this court that there was no reasonable possibility this error contributed to the verdict. See *Sherman*, 305 Kan. 88, Syl. ¶ 8.

*The Prosecutorial Errors Were Individually and Cumulatively Harmless*

If prosecutorial error occurred, or is presumed, in addition to determining whether each error is individually harmless, this court must determine whether they were also cumulatively harmless. This court has identified two errors: the prosecutor's comment in opening statement about the white car and the prosecutor's closing argument opinion that Jackson was the only person who fit the description of the assailant. After finding the errors individually harmless, this court must apply the constitutional harmlessness test and determine whether "the party benefitting from the errors [has] establish[ed] beyond a reasonable doubt that the cumulative effect of the errors did not affect the outcome." *Brown*, 316 Kan. 154, Syl. ¶ 3. Much like the analysis of the individual errors, this court "examines the errors in context, considers how the district court judge addressed the errors, reviews the nature and number of errors and whether they are connected, and weighs the strength of the evidence." 316 Kan. 154, Syl. ¶ 3.

The two errors have already been examined in context. The prosecutor's statement about the white car in the video being the same one parked outside Jackson's residence was made in the context of several facts supporting that inference. The prosecutor's second erroneous statement about Jackson being the only person who matches the assailant's description was also presented as an inferential conclusion based on supporting, uncontroverted facts. Moreover, the two errors were made at different times—one in opening statement and one in closing argument—with an entire trial of evidence between them. The errors were not related to the same topic or connected in another way. In addition, the district court mitigated the potential harm from the

18

prosecutor's closing argument comment when it instructed the jury that "[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded."

Finally, the weight of the evidence overwhelmingly supported the jury's verdict. As explained above, this evidence included (1) K.A.'s identification of the defendant as the shooter; (2) K.A.'s testimony that he and the defendant had been in an altercation before; (3) the detective's comparison of the car parked outside of the defendant's house to the car captured on the surveillance footage; (4) the consistency of the major DNA profile on the handgun found inside the car located outside the defendant's residence with the known DNA profile of the defendant; and (5) the ballistics test results demonstrating that the shell cartridges recovered from the crime scene were fired from that handgun. Given the context of the errors, the type and quality of the errors, the mitigation, and the overwhelming evidence of Jackson's guilt, even when these two errors are considered cumulatively, they do not warrant reversal. See *Ross*, 310 Kan. at 227 (holding that cumulative errors were not prejudicial when the evidence against the defendant was overwhelming).

II.     THE DISTRICT COURT'S DENIAL OF JACKSON'S MOTION TO PRESENT AN
        UNCONSCIOUS BIAS VIDEO TO ALL PROSPECTIVE JURORS DID NOT CONSTITUTE
        STRUCTURAL ERROR

"Structural error occurs when the error interferes with the court's basic function and denies a defendant the basic protections afforded during criminal trial. Structural errors are so pervasive they defy analysis by harmless-error standards and require automatic reversal." *State v. Johnson*, 310 Kan. 909, Syl. ¶ 1, 453 P.3d 281 (2019). The United States Supreme Court has identified a limited class of errors as structural:  "(1) total deprivation of counsel; (2) lack of an impartial trial judge; (3) denial of the right to

19

self-representation at trial; (4) violation of the right to a public trial; (5) erroneous reasonable-doubt instruction; and (6) unlawful exclusion of members of the defendant's race from a grand jury." 310 Kan. at 914 (citing *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 [1999]).

Jackson's claim that structural error infected his trial is a question of law over which this court exercises unlimited review. 310 Kan. at 913. A judge's refusal to permit a party to show a video about unconscious bias during voir dire is not included in the limited class of cases that constitute structural error. Similarly, there is no precedent in Kansas finding structural error based on the facts presented here, and Jackson provides no legal authority supporting this argument.

Finding no precedent, this court must evaluate whether refusing to show the jury a video about unconscious bias created a circumstance in which the jury was so infected with racial bias as to deny him a fair trial. Not only did Jackson present no evidence of racial bias within the jury, "'[t]here is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups.'" *State v. Nesbitt*, 308 Kan. 45, 58, 417 P.3d 1058 (2018) (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 190, 101 S. Ct. 1629, 68 L. Ed. 2d 22 [1981] [plurality opinion]). Moreover, the district court did not prevent Jackson from addressing racial bias with the jury but simply denied use of the requested video. Other forms of inquiry were permitted. This court finds no structural error resulted from the district court's refusal to play Jackson's requested video during voir dire.

III.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING JACKSON'S MOTION TO PRESENT A VIDEO ADDRESSING UNCONSCIOUS BIAS TO ALL PROSPECTIVE JURORS

In the likely event this court did not find the district court's denial of Jackson's motion to show the unconscious bias video to the jury to be structural error, Jackson argues the district court's decision was an abuse of discretion. "The purpose of voir dire is to enable the parties to select competent jurors who are without bias, prejudice, or partiality." *State v. Robinson*, 306 Kan. 431, Syl. ¶ 3, 394 P.3d 868 (2017). The district court is generally entrusted with the discretion to conduct voir dire in a manner to accomplish this goal. 306 Kan. 431, Syl. ¶ 3. The district court may limit juror examination during voir dire "if the court believes such examination to be harassment, is causing unnecessary delay or serves no useful purpose." K.S.A. 2022 Supp. 22-3408(3).

This court will only find reversible error resulting from the district court's voir dire limitations if the court abused its discretion and Jackson was prejudiced by the limitation. *Robinson*, 306 Kan. at 444-45. A district court abuses its discretion when its action is based on an error of law, an error of fact, or when it is so "'arbitrary, fanciful, or unreasonable'" that "'no reasonable person would take the view.'" *Gannon v. State*, 305 Kan. 850, 868, 390 P.3d 461 (2017). Jackson bears the burden of showing such abuse of discretion. *State v. Crosby*, 312 Kan. 630, 635, 479 P.3d 167 (2021). Jackson alleges that the district court's decision to deny his motion to play the unconscious bias video during voir dire was based on an error of fact and law.

a. *The district court did not base its decision to deny Jackson's motion to present the video on an error of law.*

Jackson first argues that addressing juror unconscious bias by presenting the video is, as a matter of law, superior to addressing unconscious bias through direct questioning.

21

While this argument may make logical sense because the video does not put individual potential jurors on the spot to answer personal questions about bias, there is no legal authority supporting the argument. There is no governing legal decision holding that video presentation is a superior means of addressing potential unconscious bias.

Jackson relies on the following excerpt from the United States Supreme Court's decision in *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 137 S. Ct. 855, 197 L. Ed. 2d 107 (2017):

> "Generic questions about juror impartiality may not expose specific attitudes or biases that can poison jury deliberations. Yet more pointed questions 'could well exacerbate whatever prejudice might exist without substantially aiding in exposing it.'
>
> "The stigma that attends racial bias may make it difficult for a juror to report inappropriate statements during the course of juror deliberations. It is one thing to accuse a fellow juror of having a personal experience that improperly influences her consideration of the case, as would have been required in *Warger*. It is quite another to call her a bigot.
>
> "The recognition that certain of the *Tanner* safeguards may be less effective in rooting out racial bias than other kinds of bias is not dispositive. All forms of improper bias pose challenges to the trial process. But there is a sound basis to treat racial bias with added precaution. A constitutional rule that racial bias in the justice system must be addressed—including, in some instances, after the verdict has been entered—is necessary to prevent a
> systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right. [Citation omitted.]" *Pena-Rodriguez*, 580 U.S. at 224-25.

This excerpt does not stand for the proposition that, as a matter of law, presenting a video addressing unconscious bias is superior to directly questioning potential jurors about racial bias. Nor does it state that the particular video suggested by Jackson is superior to individual questions. In this statement, the Supreme Court observes the

22

challenges and importance of addressing racial bias in jurors but does not create a rule or direction about how and when that must be done. Accordingly, this court finds no error of law in the district court's decision to deny Jackson's request to play the unconscious bias video.

    b. *The district court did not base its decision to deny Jackson's request to present the video to potential jurors on an error of fact.*

Jackson argues that the district court made an error of fact because there was nothing in the record showing that the video "would meet the three statutory criteria to limit voir dire." Jackson argues that the nearly 11-minute video would have been a *de minimis* increase to the duration of voir dire.

The district court addressed the concern about unconscious bias by permitting the parties to directly question potential jurors rather than show the proposed video. The court explained that it did not believe "that the video that has been presented would necessarily help the jury in coming to that conclusion any better than defendant's own ability to question and voir dire candidates for the jury." The court permitted the parties to address unconscious bias through direct questioning rather than playing the video, and "'[d]eference to the trial court's discretion is the hallmark of voir dire issues in criminal appeals.'" *Robinson*, 306 Kan. at 444 (quoting *State v. Hudgins*, 301 Kan. 629, 634, 346 P.3d 1062 [2015]). This court affords district courts a great deal of deference in making those decisions. This court finds no error of fact and thus no abuse of the district court's discretion when it denied Jackson's request to play an unconscious bias video during voir dire in favor of direct questioning on the issue.

IV.     AS EXPLAINED ABOVE, CUMULATIVE ERROR DID NOT DEPRIVE JACKSON OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL

Finally, Jackson argues cumulative error denied him a fair trial. However, this court only found two errors in the prosecutor's statements, which have already been addressed individually and cumulatively. Finding no other errors, there is nothing for this court to evaluate collectively for cumulative error. See, e.g., *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021).

CONCLUSION

The jury was presented with overwhelming evidence supporting Jackson's convictions, and this court finds that none of Jackson's allegations of error warrant reversal of their sound decision.

Affirmed.